### TITANIUM METALS CORPORATION OF AMERICA, Petitioner,

v.

### W. J. USERY, Secretary of Labor, U. S. Department of Labor and Occupational Safety and Health Review Commission, Respondents.

No. 75–3724.

United States Court of Appeals, Ninth Circuit.

Aug. 4, 1978.

---

Gary Goodheart (argued), Las Vegas, Nev., for petitioner.

Allen H. Feldman (argued), Washington, D. C., for respondents.

Before CHAMBERS and KILKENNY, Circuit Judges, and KELLEHER *, District Judge.

PER CURIAM:

Titanium Metals Corporation of America has petitioned this court to review an order of the Occupational Safety and Health Review Commission ("OSHRC") finding the petitioner (respondent below) to have committed a serious violation of the general duty clause of the Occupational Safety and Health Act ("OSHA").[1] Because we find that the Commission's decision is supported by substantial evidence when the record is considered as a whole, we affirm.

The finding of a violation of OSHA §§ 5(a)(1) and 17(k) was the culmination of an investigation prompted by an explosion and fire that occurred in and around a "24 to one" splitter in Unit 11 of petitioner's plant in Henderson, Nevada, on October 24, 1974, as a result of which one of petitioner's employees working on the splitter at the time sustained fatal burns.

The issue presented is whether the record, considered as a whole, substantially supports the administrative law judge's finding that petitioner committed a serious violation of OSHA's general duty clause by "allowing excessive amounts of titanium dust and fines [particles somewhat larger than dust] to accumulate on its 24 to one splitter and other surfaces in Unit 11 of its Henderson plant."

In affirming the Commission's order, we make no determination as to a matter of law of what constitutes "a recognized hazard causing or . . . likely to cause death or serious physical harm" nor do we set as a matter of law any standard in the titanium industry of permissible accumulation of dust and fines. As noted above, we do no more than apply the traditional rule of appellate review of an administrative determination. We leave to the Commission to determine on a case-by-case basis whether a violation of the statute has occurred.

Titanium challenges the decision on the grounds that (a) despite titanium's recognized flammability, nevertheless it is not a recognized hazard "causing or . . . likely to cause death or serious physical harm" within the meaning of § 5(a)(1) of the OSHA that (b) in the absence of a recognized standard in the industry regarding what level of accumulation of dust and fines constitutes such a hazard (or actual knowledge by Titanium thereof), there can be no violation of § 5(a)(1) as a matter of law, and that (c) in the absence of a showing by the Secretary of Labor ("Secretary") of what feasible and effective measures petitioner could have taken to render Unit 11

---

* The Honorable Robert J. Kelleher, United States District Judge, Central District of California, sitting by designation.

1. Occupational Safety and Health Act of 1970, § 2 *et seq.*, Pub.L. 91–596, 84 Stat. 1590, 29 U.S.C. §§ 651 *et seq.* Section 5(a)(1) of OSHA, 29 U.S.C. § 654(a)(1), establishes the general duty of each employer: "Each employer—(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees; .. . ."

A serious violation is defined in § 17(k), 29 U.S.C. § 666(j):

> For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

free of such hazard, there is no violation of § 5(a)(1) as a matter of law.

## FACTS

Petitioner produces titanium ingots at its plant in Henderson, Nevada, where it employs approximately 950 persons.

Titanium is one of the rare earth substances known as reactive metals, which, because of their tendency to combine with oxygen and nitrogen, cannot be processed by the standard metallurgical processes. Instead titanium is processed inside a sealed reactor. Its affinity for atmospheric gases means that in small particles such as dust or fines it is highly flammable, a fact concerning which there is no dispute. Titanium dust and fines can be ignited by heat, sparks, friction, or simply striking other similar particles. Consequently, the metal must be handled with care.

Unit 11 of petitioner's Henderson plant is a separate area where approximately sixty employees work each shift. About six work on or near a "24 to one" splitter located within Unit 11. The splitter, a large cylindrical machine over thirty feet tall, is utilized in processing titanium. Titanium "sponge"—an interim form between raw ore and finished ingots—passes from a large overhead tote bin into the splitter's funnel-like feed hopper where it is separated (or "split") by a counterclockwise rotation which distributes the sponge equally into 24 chutes. At the bottom of each chute, a barrel or drum collects the falling sponge. The sponge varies considerably in coarseness and is graded into one of thirteen "codes." A split, four of which typically are made during each shift, involves no chemical change in the titanium.

The splitter operator discharges the sponge from a tote bin by standing on a 24 by 14 foot platform at the third (top) level of the splitter and opening a lock on the bin with a tool called a "T-bar" wrench. This wrench, made of rolled steel, is also used to "bang" the tote bin so as to dislodge sponge caught in the lock and door. The titanium sponge then falls through the feed hopper and, after the split is complete, into the 24 barrels or drums located at ground level below the corresponding chutes.

Splitting titanium sponge produces dust and fines, the amount varying with the grade (or "code") of the sponge being split. The particles typically will suspend in the air and gradually settle on the floors, platforms, beams and walls in and around the splitter. There are a variety of sources of such dust and fines: (a) the tote bin, as it is opened to release sponge into the feed hopper; (b) leaking chutes; and (c) an opening (of six to eight inches) between the bottoms of the chutes and tops of the collecting drugs. (This last is the greatest source of escaping dust and fines.)

To minimize the amount of dust and fines which escaped during the splitting operation, a "rotocomb unit" or collecting tube was installed on the splitter. (Earlier use of a vacuum cleaner-like system had been discontinued due to the fact that that method presented an additional source of ignition, which had on occasion caused fires.) The fan-generated rotocomb unit sucks dust from the top of the splitter hopper into a dust collector.

In addition to the "rotocomb unit," petitioner sought to minimize accumulations of titanium dust and fines by periodic washdowns of the entire area (including walls) and by sweepdowns (at the end of each shift) of the splitter decks and surrounding floor area in Unit 11.

On October 24, 1974, swing-shift splitter operator Randall Kemp released a load of "code 7" sponge from the tote bin into the feed hopper of the splitter. Instantaneously, an explosion and fire erupted on or in the vicinity of the splitter. The fire spread rapidly to other parts of Unit 11, including the walls. Kemp, who had been standing on the third level platform in order to open the tote bin, sustained burns that proved fatal.

## ADMINISTRATIVE PROCEEDINGS

On October 25, as a result of the fatality, an OSHA compliance officer made a routine investigation of the Henderson plant.

On November 5, the Secretary issued two serious citations based on alleged violations of the general duty clause (1) for failure to provide "non-sparking" tools and equipment (i. e., the "T-bar" wrench and the lach assembly on the tote bins) "in an area where explosive conditions existed (the presence of titanium dust and fines), and a stray spark could trigger an explosion" and (2) for allowing "flammable accumulations of titanium dust and fines . . . to accumulate on horizontal surfaces of the 24 to one press splitter, surrounding equipment, and inside structural members of the building."

The Secretary proposed a penalty of $800 for each of the serious violation citations (Citation Nos. 2 and 3). Petitioner timely contested each charge, and by consent of the parties they were tried together before the administrative law judge. At the close of the hearing, the Secretary withdrew Citation No. 2 on the grounds that the charge had merged into and was "part and parcel" of Citation No. 3. This citation was affirmed by the administrative law judge who assessed a penalty of $900. His order is final and is here for review, petitioner having exhausted his administrative remedies.

## A. SCOPE OF REVIEW

■ Preliminarily the Court notes that review is limited to the record produced before the administrative law judge, 29 U.S.C. § 660(a). Of more immediate import, review of the findings of fact below is limited to a determination of whether such findings are "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 660(a). *Hartwell Excavating Co. v. Dunlop,* 537 F.2d 1071, 1073 (9th Cir. 1976).[2]

In remarking on the narrow review provided by OSHA, the Court of Appeals for the District of Columbia Circuit, in a leading case on the subject of the general duty clause, aptly has noted:

A reviewing court will typically be concerned only with the Secretary's production burden. The burden of proof presumably also includes the burden of persuading the Commission, or its hearing examiner, by a preponderance of the evidence, but a reviewing court must uphold a Commission finding supported by substantial evidence, and the Commission's view on the preponderance of the evidence is otherwise final.

*National Realty & Construction Co., Inc. v. OSHRC,* 160 U.S.App.D.C. 133, 489 F.2d 1257, 1263 n. 24 (1973).

Having this in mind, and similarly having in mind that "[u]nder the [general duty] clause, the Secretary must prove (1) that the employer failed to render its workplace 'free' of a hazard which was (2) 'recognized' and (3) 'causing or likely to cause death or serious physical harm,' " *id.* at 141, 489 F.2d at 1265, the Court proceeds to a review of the record in this case as it bears on the elements of a violation of § 5(a)(1) and on petitioner's contentions previously noted.

## B. RECOGNIZED HAZARD CAUSING OR LIKELY TO CAUSE DEATH OR SERIOUS PHYSICAL HARM

While petitioner concedes titanium's high flammability when in the form of dust or fines, it argues that the hazard posed thereby is not a "recognized hazard that [is] causing or [is] likely to cause death or serious physical harm," as required by § 5(a)(1) in order to trigger the employer's duty to "free" its employees' place of employment from such a hazard.

Petitioner relies on the relative infancy of the titanium industry, which is less than thirty years old, the fact that no precise standards exist respecting what levels of accumulation of titanium dust and fines

---

**2.** The standard of review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), similarly applies to review of OSHRC decisions, *Brennan v. OSHRC (Hendrix d/b/a Alsea Lumber Co.),* 511 F.2d 1139, 1141 (9th Cir. 1975) (no fact dispute); *Dunlop v. Rockwell Int'l,* 540 F.2d 1283, 1288 (6th Cir. 1976) and cases cited

therein. "The reviewing court shall— . . . (2) hold unlawful and set aside agency action, findings, and conclusions, found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . ."

present such a hazard (to be discussed in the next section), and the fact that while there have been numerous fires in the Henderson plant and in Unit 11 in particular over the past eight years, many if not most attributable to or at least fueled by titanium dust and fines, none has been similar in magnitude or effect to the October 24, 1974, conflagration in which Kemp was fatally burned. Moreover, petitioner argues that no explosion had ever occurred before, that titanium burns not like gasoline or gunpowder but like a fuse, that the vast majority of the previous fires were minor and easily contained (most having been extinguished by employees before the private fire fighting contractor, who is routinely summoned no matter now small the fire, had arrived), and that there was no finding by the administrative law judge that titanium particles caused the explosion which, petitioner argues, was primarily responsible both for Kemp's death and for the unusually rapid spread of the blaze throughout Unit 11. Petitioner urges that the above conclusively demonstrates that while titanium dust and fines may have presented a "recognized hazard," any such hazard was of a relatively minor nature and certainly not one "causing or . . . likely to cause death or serious physical harm."

█ An activity or practice may be a "recognized hazard" even if the employer is ignorant of the existence of the activity or practice or its potential for harm. *National Realty, supra,* 489 F.2d at 1265 n. 32.

Here, there can be no doubt on this record that the fire hazard posed by titanium generally and by the accumulation of dust and fines in particular was recognized both throughout the industry and by petitioner itself. The National Fire Code, NFPA No. 481–1972, whose revision petitioner's plan engineer (Kraeger) was instrumental in drafting, its experience with numerous titanium fires and with employee complaints (of an informal nature) respecting both fire and other hazards (e. g., respiratory) resulting from excessive accumulations of dust and fines, and its adoption of a safety program at its Henderson plant all attest to the hazard posed by titanium as being one which is "recognized."

█ Turning to petitioner's contention that the hazard presented by titanium dust and fines reasonably was believed not to be one likely to cause death or serious physical harm, the Court notes that "[i]f evidence is presented that a practice *could* eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances, the Commission's expert determination of likelihood should be accorded considerable deference by the courts." *National Realty, supra,* 489 F.2d at 1265 n. 33 (emphasis supplied). *See California Stevedore & Ballast Co. v. OSHRC,* 517 F.2d 986, 988 (9th Cir. 1975), *citing Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965); *Dunlop v. Rockwell Int'l,* 540 F.2d 1283, 1289–90 (6th Cir. 1976); *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255, 1267 (4th Cir. 1974). *Cf. Irvington Moore v. OSHRC,* 556 F.2d 431, 434 (9th Cir. 1977) (Secretary's interpretation of his own regulations, affirmed by the Commission, to be accorded substantial weight).

The gravamen of the complaint was that petitioner had permitted excessive amounts of titanium dust and fines to accumulate, which created a serious hazard not only from the point of view of a fire igniting but also from the standpoint of its spreading (however started). The administrative law judge found:

[T]he widespread [sic] and heavy accumulation of titanium dust and fines in Unit 11 *outside* the splitter was the recognized hazard; such accumulation enabled the fire to quickly spread throughout the unit, endangering the lives of many workmen, if not actually contributing to the death of Randall Kemp. *The explosion in the splitter may not have been foreseeable* as nothing like it before had occurred (although employees who had to unload the tote bins from the top deck of the splitter were fearful of what might happen), *but the rapid spreading of the fire throughout the unit where there were heavy accumulations of dust was.*

(First emphasis in original; other emphases supplied.)

There was ample testimony concerning the especially heavy dust and fines produced by "code 7" sponge, the fact that bins of this grade sponge were split almost daily, the fact that the last washdown of Unit 11 had occurred six to eight weeks prior to October 24, 1974, the fact that sweepdowns required by petitioner's safety program after each shift were left largely unsupervised and uninspected and often were done, if at all, in a less than thorough manner, the fact that dust and fines could serve as fuel for a fire, however started, and the fact that "non-sparking" tools and equipment were not utilized in and around the splitter. The administrative law judge concluded:

> Whatever the cause of the explosion, the several weeks' accumulations of dust and fines presented a dangerous situation that could well have resulted in death or serious injury to [petitioner's] employees. Once ignited, it was likely that the fire would spread quickly throughout the Unit 11 where the heavy accumulations were.

■ While it is beyond dispute that an accident need not occur for a violation of § 5(a)(1) properly to be found, *Brennan v. OSHRC (Vy Lactos Laboratories )*, 494 F.2d 460, 463 (8th Cir. 1974); *National Realty, supra*, 489 F.2d at 1267; *REA Express, Inc. v. Brennan*, 495 F.2d 822, 825 (2d Cir. 1974); *Brennan v. Butler Lime & Cement Co.*, 520 F.2d 1011, 1017 (7th Cir. 1975); *Lee Way Motor Freight, Inc. v. Secretary of Labor*, 511 F.2d 864, 870 (10th Cir. 1975), conversely it has been held that "while the occurrence of injury may be relevant to proving a violation, it is not conclusive." *Cape Vineyard Division of New Bedford Gas & Edison Light Co. v. OSHRC*, 512 F.2d 1148, 1150 (1st Cir. 1975).

The findings, previously set forth, indicate that his decision did not rest on the fact that Kempt was fatally burned in the October 24 explosion and fire.

We have held that where an employer's safety record is the only evidence offered concerning whether a reasonably prudent man would have found that further precautions against a particular hazard were necessary where certain precautions already existed, the Commission's order vacating a citation for a violation of § 5(a)(1) is not supported by substantial evidence. *Brennan v. Smoke-Craft, Inc.*, 530 F.2d 843, 845 (9th Cir. 1976). *See Allis-Chalmers Corp. v. OSHRC*, 542 F.2d 27, 31 (7th Cir. 1976), wherein the court stated:

> [A]lthough the fact that petitioner had an accident-free or injury-free record could properly be considered in determining the gravity of the violation for which it was cited, we are not impressed with petitioner's argument that its past record is dispositive in light of the Commission's finding that there existed a general fall hazard, and in light of the Act's declared policy to prevent the occurrence of accidents and injury.

These cases answer petitioner's contention that its history of only minor incidents of fire demonstrate that the accumulation of titanium dust and fines did not pose a hazard "causing or . . . likely to cause death or serious physical harm" and that consequently the Commission's finding of a violation of § 5(a)(1) was not supported by substantial evidence and thereby erroneous as a matter of law.

## C. ABSENCE OF PRECISE STANDARDS RE LEVELS OF ACCUMULATION

Related to petitioner's argument that the accumulation of titanium dust and fines existing in Unit 11 on October 24, 1974, have not been shown to have been likely to cause death or serious injury is its emphasis on the present lack of any recognized standards with regard to what levels of accumulation pose such a hazard.

There was testimony both from the Secretary's and petitioner's witnesses that under current technology it is impossible to produce titanium on a commercial scale without producing some dust and fines in the process. Similarly, a review of the National Fire Code, NFPA No. 481–1972, and

testimony regarding its contents reveals that it contains no precise standard(s) that indicates what level of accumulation of titanium dust and fines would be dangerous in the sense of being "likely to cause death or serious physical harm." Kraeger, petitioner's plant engineer and member of the industry committee responsible for the 1972 revision of the Code, testified that there is a need for research on this issue but that such testing should be conducted under the auspices of a disinterested group rather than the industry itself. He stated that petitioner had undertaken no such research on its own.

In applying the "likely to cause" element of the general duty clause, it is improper to apply mathematical tests relating to the probability of a serious mishap occurring. *National Realty, supra,* 489 F.2d at 1265 n. 33, given the Act's prophylactic purpose to prevent employee injuries, *Allis-Chalmers Corp., supra.* In construing a similar element of § 17(k), 29 U.S.C. § 666(j), defining a "serious violation" of OSHA, we have previously affirmed the Secretary's view that "substantial probability that death or serious physical harm could result" refers not to the probability that an accident of such nature will occur but only to the probability that, an accident having occurred, death or serious injury *could* result. *California Stevedore, supra,* 517 F.2d at 988.

In the instant case, this rule must be viewed in the context of the variable factor (i. e., the *level* of accumulation) which necessarily inheres in the "recognized hazard" (i. e., the risk of fire from *any* accumulation). The fact that no precise standard exists as to what level of accumulation is dangerous in the § 5(a)(1) sense, far from relieving petitioner of the burden of minimizing accumulations, arguably imposes an even greater duty on petitioner, faced with the obligation of taking feasible measures to assure the safety of its employees, to err, if at all, on the side of greater, not lesser, caution. To be sure, this obligation must be reconciled with the reasonable limitation placed on the employer's general duty, that is, the duty of the employer to eliminate only those hazards which are "foreseeable

and preventable." *California Stevedore, supra,* 517 F.2d at 988. In the context of the Secretary's burden of establishing a violation of § 5(a)(1), this means that the record must indicate that "demonstrably feasible measures would have materially reduced the likelihood that such [injury] would have occurred." *National Realty, supra,* 489 F.2d at 1267. Put another way: "[T]he Secretary must be constrained to specify the particular steps a cited employer should have taken to avoid citation, and to demonstrate the feasibility and likely utility of those measures." *Id.* at 1268. It is to this element (and its relation to the absence of precise standards regarding dangerous levels of accumulation) that we now turn.

### D. FEASIBLE MEASURES PETITIONER COULD HAVE TAKEN

Petitioner has argued that, given the impossibility of mass-producing titanium without creating some dust and fines and given the absence of a precise standard establishing what level of accumulation is likely to cause death or serious physical harm, affirming the Commission's order in this instance would require petitioner to render its plant "free" of any accumulations and in so doing impose a standard of strict liability inconsistent with OSHA's intent.

Nothing of the sort would be proper; nor does this Court's decision impose such a standard. OSHA was never designed, nor could it have been, to eliminate all occupational accidents. Rather, it is designed to require "a good faith effort to balance the need of workers to have a sale [sic] and healthy work environment against the requirement of industry to function without undue interference." Legislative History of the Occupational Safety and Health Act of 1970, Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92nd Cong., 1st Sess. (Comm. Print 1971) at 435 (Remarks of Senator Williams), *quoted in Anning-Johnson Co. v. OSHRC,* 516 F.2d 1081, 1088 (7th Cir. 1975).

We have held that "[t]he employer's duty, . . . under the general duty clause,

must be one which is *achievable.*" *Brennan v. OSHRC (Hendrix d/b/a Alsea Lumber Co.)*, 511 F.2d 1139, 1144 (9th Cir. 1975) (emphasis supplied). *Accord, National Realty, supra*, 489 F.2d at 1265–66 ("Congress intended to require elimination only of preventable hazards").

In *National Realty* the court reversed a finding of a violation of the general duty clause, holding that such finding was not supported by substantial evidence in the absence of a showing by the Secretary of particular steps the employer should have taken to avoid the citation, and of the feasibility and likely utility of those measures. *Id.* at 1267–68. Having first noted the elements of a § 5(a)(1) violation, *id.* at 1265 (see *supra* slip opinion at 540), and having found the Commission's findings with respect to the last two elements supported by substantial evidence, *id.*, the court nevertheless found that the Secretary had failed to satisfy his *burden of going forward* with respect to the first element and consequently substantial evidence to support the violation was necessarily lacking. The court emphasized in so holding that "the hearing record is barren of evidence describing, and demonstrating the feasibility and likely utility of, the particular measures which National Realty should have taken to improve its safety policy. Having the burden of proof, the Secretary must be charged with these evidentiary deficiencies." *Id.* at 1267. *Accord, General Electric Co. v. OSHRC*, 540 F.2d 67, 69–70 (2d Cir. 1976).

Unlike the case in *National Realty*, in this instance the Secretary offered ample evidence concerning what steps were open to petitioner which could and should have been taken to eliminate or substantially reduce the hazard of fires emanating from or fueled by accumulations of titanium dust and fines. Block, the Secretary's metallurgy expert, testified that the best way to minimize the possibility of fires is to keep the particles isolated because, whereas small amounts of burning reactive metal can be controlled, a fire can spread very rapidly wherever dust and fines have accumulated.

The administrative law judge found, and the record viewed as a whole contains substantial evidence to support his findings, that (1) there were heavy and extensive accumulations in and around the splitter in Unit 11 on October 24, 1974, and for many days before; (2) this fact had been reported to petitioner's foreman in charge of Unit 11; (3) there were several ignition sources (e. g., the "T-bar" wrench and the tote bin latch assembly [not made out of "nonsparking" materials]; oil spillage near the press in Unit 11) which could have been eliminated or substantially reduced; (4) the most recent of two washdowns of the area in 1974 had occurred six to eight weeks prior to October 24; (5) sweepdowns of the decks of the splitter and surrounding floor area required at the end of each shift (but not of the beams and other surfaces, which were not swept at all) typically were not supervised or inspected and were not always done, at least not in a thorough manner; and (6) the only means of escape from the top level of the splitter required an operator to walk down a flight of stairs which passed beneath the duct of the rotocomb dust collector system. He concluded:

> *[T]he hazard present here, the excessive accumulation of titanium dust and fines, could have been eliminated by better housekeeping, particularly by more frequent wash downs* [sic]. The record indicates that [petitioner's] officials did not insist upon a thorough sweeping at the end of each shift. But more important, wash downs were not carried out as frequently as they should have been. How often a wash down should be performed will, of course, necessarily vary depending on the operation of the splitter and the resulting accumulation. *There was testimony that a wash down could, and should, have been carried out once each week.* This is a reasonable requirement in the interest of job safety when the splitter is in regular use, even though it may well interfere with the production of titanium.

. . . . .

*It may not be possible to manufacture titanium without some dust and occasional fines, but it is possible to restrict the accumulation so there will not be fuel for a larger fire.*

(Emphases supplied.)

On March 17, 1978, this case was argued orally and ordered submitted for decision. Thereafter, on May 23, the Supreme Court held that the Occupational Safety and Health Act "is unconstitutional insofar as it purports to authorize inspections without warrant or its equivalent . . . ." *Marshall v. Barlow's, Inc.,* —— U.S. ——, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

No constitutional issue was raised before the agency or here concerning the inspection of petitioner's premises made by an agent of OSHA on the day following the accident. We consider the holding in *Marshall* to have no application to the record before us.

Having determined that the findings of the Commission are supported by substantial evidence in the record considered as a whole, 29 U.S.C. § 660(a), and having determined that its order affirming the citation was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), we affirm the order of the Commission.