**ILLINOIS POWER COMPANY,**
**Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray Marshall, Sec'y of Labor, Etc., Respondents.**

**No. 79–1721.**

United States Court of Appeals,
Seventh Circuit.

Heard Feb. 15, 1980.

Decided April 29, 1980.*

Opinion June 13, 1980.

* This appeal was originally decided by unreported order on April 29, 1980. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

**26**

Harley Hutchins, Mayer, Brown & Platt, Chicago, Ill., for petitioner.

Domenique Kirchner, Dept. of Justice, Washington, D. C., for respondents.

Before CUMMINGS, SPRECHER and TONE, Circuit Judges.

CUMMINGS, Circuit Judge.

On September 8, 1978, pursuant to Section 9(a) of the Occupational Safety and Health Act (29 U.S.C. § 658(a)), the Secretary of Labor issued a citation and notification of penalty to Illinois Power Company charging that the Company had violated Section 5(a)(1) of the Act.[1] The citation stated that on or about August 8, 1978:

"[a]n employee was allowed to begin work on upgrading of an existing electrical service located between transformer station No. 10930 and a residence located at No. 30, South 97th Street, Belleville, Illinois before all live or grounded conductors and surfaces with which the employee could possibly make contact (except that portion of the conductor on which work was to be done) were covered with approved insulating devices or de-energized and grounded or the employee effectively isolated, insulated, or guarded from such conductive objects."

The citation alleged that the violation was serious under Section 17(k) of the Act.[2] It also set September 14, 1978, as an abatement date and proposed a penalty of $640.

On September 28, the Company filed a notification of intent to contest the citation under Section 10(c) of the Act (29 U.S.C. § 659(c)). Consequently the Secretary of Labor filed a complaint with the Occupational Safety and Health Review Commission on October 30, 1978. After two days of hearings, a judge of the Review Commission concluded that the Company had indeed violated Section 5(a)(1) of the Act and that the violation was serious within the meaning of Section 17(k) of the Act. The judge thus affirmed the September 8 citation. After the full Commission denied the Company's petition for discretionary review, the judge's decision became final under Section 12(j) of the Act (29 U.S.C. § 661(i)) and the Company filed a petition here to review the Commission's order under Section 11(a) of the Act (29 U.S.C. § 660(a)). We now affirm the Commission's order upholding the Secretary's citation and enforce the order requiring abatement and payment of the $640 penalty.

The citation in this case arose out of an inquiry by the Secretary following the electrocution death of journeyman lineman Sydney Stevenson. On August 7, 1978, Stevenson was working as part of a two–man crew on upgrading some residential service lines at the location described in the citation. The job of upgrading residential service requires the replacing of old service lines between a particular house and a service pole, to which lines of secondary voltage are connected. These lines carrying secondary voltage, commonly described as voltage under 300 volts, are usually "uncovered" in that they lack insulation. While working on the lines on what was con-

---

1. Section 5(a)(1) provides:
"Duties of employers and employees
(a) Each employer–
(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." (29 U.S.C. § 654(a)(1).)

2. Section 17(k) of the Act provides:

"For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." (29 U.S.C. § 666(j).)

sidered a "normal" job, Stevenson was wearing leather gloves and a hard hat, but took no further precautions against the uncovered lines. Thus he did not use rubber gloves, a rubber line hose or insulating blankets to protect himself from contact with the secondary voltage. The Company's safety manual requires a lineman to use such protective covering in just such a situation, though the Company apparently did not strictly enforce the rule, leaving it to each lineman to decide when covering is necessary.

Eugene Richard, also a journeyman lineman, was leadman of the crew and was aware of Stevenson's work near uncovered lines. Richard did not see how the electrocution occurred and a subsequent restaging of the accident failed to reveal the cause of the accident. According to the findings of the hearing judge, however, Stevenson's position while working in a nest of 110 volt to 220 volt lines from an insulated boom bucket readily permitted him to complete a circuit between various of the lines, allowing electricity to flow through him. That result was admittedly one that could cause death. The hazard was apparently increased by the fact that Stevenson was perspiring at the time.

There is no rule of the Occupational Safety and Health Administration (OSHA) prescribing the use of covering in working with secondary voltage, but there was testimony at the hearings that the practice of companies in the industry is to require such covering. A Commission expert testified at the hearing that Stevenson's position at the time of the accident was one of a "high hazard" and that the hazard was not lessened by the fact that the voltage was less than 300 volts. Company expert Gail Relph testified that it is amperage and not voltage that creates the danger and that there was sufficient amperage in the lines to kill (Resp. Exh. 8 at 14, 38), but that he did not regard it as particularly hazardous for a trained lineman to perform the job with the secondary lines uncovered. There was some dispute whether any lineman had previously been killed by contact with secondary voltage lines. Relph's testimony was itself equivocal, stating on direct examination that he did not know of anyone having been killed in his company, and on cross-examination that linemen in the industry had been killed "very, very few times" (Resp. Exh. 8 at 14, 39). It was uncontested that no other Illinois Power employee had been killed working in a position similar to Stevenson's, but that one employee had five years earlier been burned while working on a similar job.

The hearing judge's 42-page opinion detailing these and other facts surrounding the accident concluded that permitting Stevenson to work on these lines without protective covering was a violation of the Act and that the violation was serious. The Company now challenges that decision on two closely related grounds. First, it asserts that the judge simply failed to apply the standards supplied by the Act for determining whether a violation has occurred. Second, even if the judge did make the appropriate findings, the Company states there was not substantial evidence in the record to support those findings. We reject both contentions.

Section 5(a)(1) of the Act sets forth three elements that the Secretary must prove to sustain a violation. First, the employer must have failed to render its workplace free of a hazard. Second, the hazard must be one that is "recognized." Lastly, the hazard must be one that is causing or is likely to cause death or serious physical harm. The Company insists that the hearing judge found a violation of the Act without determining that the supposed hazard was one that met the last of these criteria. It notes that the hearing judge's conclusions of law do not employ the "causing or likely to cause" language of Section 5(a)(1) of the Act, and that the judge found only that the hazard in question "could" cause death. These conclusions cannot be read in isolation, however, and a brief review of the decision as a whole clearly demonstrates that the hearing judge applied the correct standards.

First, the hearing judge repeatedly refers to the language of Section 5(a)(1) and he must be presumed to be aware of its directives. Second, in the Discussion section of his report the hearing judge explicitly sets out the criteria noted above and acknowledges that the complainant must prove more than that the offending condition is hazardous. He thus noted that the hazardous condition must be one "causing or likely to cause death or serious bodily harm" (App. 1 at 33). Moreover, the judge considered and expressly rejected the Company's argument that the hazard involved here failed to meet this criterion and at one point explicitly stated that the deceased employee had been exposed to the risk of serious injury or death (App. 1 at 37). Finally, the hearing judge supported his conclusions by reference to testimony and evidence in the record. Thus he noted the testimony of the expert witnesses regarding the cause of Stevenson's death and the support provided by a knowledge of basic physical law. In addition, he specifically found in his findings of fact that in working in the configuration he did, Stevenson was in a "high hazard" position, as contended by the Commission's expert. Notwithstanding the Company's argument to the contrary, the record amply supports the conclusion that the hearing judge observed the statutory standards.

The heart of the Company's appeal is not that the hearing judge ignored the proper standards or failed to make findings in support of them, but rather that the findings he made do not support his conclusion that the Act was violated or that the violation was serious. The Company asserts that the Secretary's evidence established only that the practice at issue could cause death or serious physical harm, not that it was causing or likely to cause such harm. The Company also contends that whatever evidence existed that the practice fell within the standard was merely tautological or the result of preconceived notions about physical law. Finally, it contends that it supplied evidence that contact with secondary voltage had never caused serious harm previously and that the usual result of such contact was a minor shock. Thus, it says, the practice was not a recognized hazard.

The Company's argument stems in part from a misapprehension of the kind of evidence necessary to show that a hazard is likely to cause death or serious physical harm or to show that a violation is serious. Looking primarily to a balance of the need for safety in the workplace against the interests of the industry to operate without undue interference, the statutory standard does not imply any mathematical test of probability. *Titanium Metals Corp. v. Usery*, 579 F.2d 536, 543 (9th Cir. 1978). Rather the Act is concerned with preventability and therefore with possible hazards and potential danger. *Usery v. Marquette Cement Manufacturing Co.*, 568 F.2d 902, 910 (2d Cir. 1977). As a result, although the fact of an accident may not be sufficient to prove the likelihood of an injury, it is at least *prima facie* evidence of a likelihood (*ibid.*) and the rest may be supplied by common sense or an understanding of physical law. *Ibid.; National Realty & Construction Co. v. Occupational Safety & Health Review Comm'n*, 489 F.2d 1257, 1265 n. 33 (D.C.Cir. 1973). It is settled, moreover, that "[i]f evidence is presented that a practice *could* eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances, the Commission's expert determination of likelihood should be accorded considerable deference by the courts." *Titanium Metals Corp., supra*, at 541 (citing cases). Finally, the language in Section 17(k) requiring a "substantial probability that death or serious physical harm could result" in order to find a serious violation refers not to the probability that an accident will occur but to the probability that, an accident having occurred, death or serious injury could result. *Brennan v. Winters Battery Manufacturing Co.*, 531 F.2d 317, 324 (6th Cir. 1975), certiorari denied, 425 U.S. 991, 96 S.Ct. 2202, 48 L.Ed.2d 815.

Under these principles there was ample evidence to support the Commission's conclusions. This accident occurred in a

context in which prevention was admittedly not only feasible but also inexpensive and easily accomplished with little inconvenience to the Company. The very fact of the injury to Stevenson, meanwhile, is powerful evidence of a likelihood of injury and, while not dispositive, is sufficient under the prevailing standards to give rise to a *prima facie* case that a violation has occurred. That case was bolstered by the evidence that another employee of Illinois Power had previously been hurt in a similar situation and that the situation in which Stevenson was working was in any event a normal one. Common sense supplies much of the rest. Secondary lines such as those Stevenson was working on apparently carry from 60 to 200 amperes and, as noted by the Company's expert, it does not take very much amperage to kill. The hearing judge noted that the photographic exhibits in the record show that "almost any type of bodily movement on the part of the deceased would put him in close proximity to an energized line and/or neutral creating the potential of creating a circuit" (App. 1 at 36). It is just such a circuit that is said to give rise to the danger of electrocution. Thus there is evidence that "a practice *could* eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances," and this evidence together with the fact of Stevenson's death compels the conclusion that "the Commission's expert determination of likelihood should be accorded considerable deference." *Titanium Metals Corp., supra,* at 541.

These facts also provide *prima facie* support for the conclusion that the violation was serious, for there was a substantial probability that if an accident did occur and an employee did complete a circuit between the wires at the service pole, the result could be death. In the face of these conclusions, the Company has offered little compelling evidence in rebuttal. The evidence was equivocal whether other linemen had been killed in the situation at issue and in any event the mere absence of a previous accident is not persuasive evidence that a hazard cognizable under the Act does not

exist, particularly where common sense and physical law dictate otherwise. Although the Company's expert Mr. Relph testified that he did not regard the position Stevenson was in as particularly dangerous, the Commission's expert Mr. Mitchell found that the position was one of "high hazard." It is beyond cavil that the hearing judge is entitled to assess the credibility of the witnesses and his iteration of Mitchell's conclusion suggests he found Relph's testimony unpersuasive, due perhaps in part to Relph's admission that his own employer required in its safety manual that all live or grounded lines be covered (Resp. Exh. 8 at 37). Finally, Relph's testimony regarding the rules of his company reflected the evidence on the practice in the industry generally, which demonstrated that the hazard was widely regarded as very real. At the least, this evidence is illative support for the conclusions of the hearing judge.

██ Finally, the evidence of the practice in the industry simply overwhelms the Company's argument that the hazard, however real, was not "recognized." The Government's rebuttal witness James Hoag testified that the company with which he was associated required such a rule and summarized his observations of other companies by stating that "the position of the companies within the industry, is that rubber goods are used and protection is taken against secondary voltages" (Tr. 197–198). The hearing judge specifically found that Hoag's expertise entitled him to make such a judgment, which was permissible in any event under the relaxed evidentiary rules for agency deliberations. Moreover, Hoag's conclusion was supported by the fact of Illinois Power's own safety rule and the testimony of both Relph and Mitchell. That Illinois Power failed to enforce its rule merely restates the violation rather than excusing it. Finally, we are not entitled to draw, as the Company suggests we should, any negative inference from the absence of any OSHA standard for secondary voltages. *National Realty & Construction Co., supra,* at 1261.

The Commission's order is affirmed and enforced.