**GEORGE J. IGEL & CO., INC.**
Plaintiff–Appellee,

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Secretary of Labor, Defendants–Appellants.**

No. 01–3540.

United States Court of Appeals, Sixth Circuit.

Oct. 30, 2002.

Before NORRIS and CLAY, Circuit Judges; and O'MEARA, District Judge.*

## OPINION

OMEARA, District Judge.

Plaintiff/Appellant George J. Igel & Co., Inc. ("Igel") appeals the Final Order of the Occupational Safety and Health Review Commission (the "Commission") concerning two violations of the Occupational Safety and Health Act ("OSHA") on construction site standards. Igel argues that both findings of violation should have been vacated, or, alternately, that one violation should have been reclassified as "other than serious" and the other vacated. This Court has jurisdiction of this case under 29 U.S.C. § 660(a) because the alleged violations occurred in this Circuit and the employer filed its petition for review in this court on May 18, 2001, within sixty days of the issuance of the Commission's Final Order. For the following reasons, the Commission's Final Order is AFFIRMED.

## I. BACKGROUND

Joseph Igel is vice president and part owner of Igel & Company ("Igel"), a construction site company. In the summer of 2000, Igel was hired as a subcontractor to remove sludge and mud from a site in Columbus, Ohio. On August 24, 2002, an OSHA compliance officer visited the Igel work site and observed Igel employee mechanic Michael Testa performing maintenance on a dump truck. Testa had been instructed to repair the truck's malfunctioning backup alarm, which had become caked with sludge. At the time he was performing this maintenance, the truck's dump bed was tilted upwards by its hydraulic arms, so that the dump bed was positioned as if it was dumping its contents. If an employee were caught between the dump bed and the truck's frame, the employee would be crushed.

Testa was standing at the side of the truck bed behind the back tire, using a compressed air nozzle to clean out the dirt around the alarm. The OSHA compliance officer stated that there was dirt on Testa's shirt shoulder and helmet. This observation is relevant because 29 C.F.R. § 1926.302(b)(4) requires that compressed air used for cleaning must be less than 30 pounds per square inch ("p.s.i.") and the air coming from Testa's nozzle was at 160 p.s.i. At the hearing, the compliance officer stated that the higher pressure put Testa at risk of harm from flying rocks and dirt displaced by the compressed air. Igel contends that Testa was not at any such risk, because the nozzle handle was two feet long, Testa was wearing prescription glasses with plastic lenses, and Testa was blowing the dirt away from himself.

The second violation was that the dump truck lacked a lockout device, which is a bar that fits through two lined-up holes of the truck frame and the elevated dump bed, so that the dump bed cannot collapse in case of mechanical failure. Although 29 C.F.R. § 1926.601(b)(10) requires that dump trucks have such a device permanently attached to them, when Testa was cleaning the truck, it had no such device. Both Testa and the driver of the truck testified that the lockout device had been removed from the truck approximately one week before. Igel claims to have been unaware of this missing device prior to the inspection. According to Igel, it was the responsibility of the truck driver to per-

* The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

form daily inspections of the truck, although admittedly these inspections were not documented. The compliance officer cited the lack of a lockout device as a violation because the dump bed could collapse and crush the employee without the device. Igel argues that there was no such risk because the truck was turned off while Testa was cleaning it, and that the mechanics of the hydraulic arms of the truck made it impossible for them to move while the truck was turned off.

After the inspection, the Secretary of Labor issued a citation to Igel for violation of the two regulations discussed above. The compressed air violation was Citation 1, Item 2, and the lack of a lockout device was Citation 1, Item 3.[1] The Secretary proposed that both violations be characterized as serious, and that penalties of $1,300 and $4,500, respectively, be assessed. Administrative Law Judge Simko affirmed both Items 2 and 3 of the citation, and assessed lowered penalties of $300 and $2,000, respectively.

## II. DISCUSSION

### A. STANDARD OF REVIEW

When reviewing a decision of the Commission, this Court must uphold findings of fact that are supported by substantial evidence in the record. 29 U.S.C. 660(a); *National Eng'g & Contracting Co. v. Herman,* 181 F.3d 715, 719 (6th Cir.1999). Additionally, the Commission's legal conclusions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A); *National Eng'g & Contracting Co.,* 181 F.3d at 719.

### B. LAW AND ANALYSIS

The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651, ("OSHA") provides that the Secretary of Labor may promulgate safety and health standards and requires each employer to comply with these standards. To establish a violation pursuant to section 5(a)(2) of OSHA, "the Secretary must show by a preponderance of the evidence that (1) the cited standard applies to the facts; (2) the requirements of the standard were not met; (3) employees had access to the hazardous condition; and (4) the employer knew or could have known of the hazardous condition with the exercise of reasonable diligence." *Carlisle Equip. Co. v. Secretary of Labor,* 24 F.3d 790, 792 (6th Cir.1994).

a. *The compressed air standard violation (Item 2)*

The compressed air standard at issue provides that "[c]ompressed air shall not be used for cleaning purposes except where reduced to less than 30 p.s.i. ...." 29 C.F.R. § 1926.302(b)(4). It is undisputed that the cited standard applies to Testa's use of compressed air for cleaning and that the 160 p.s.i. used did not meet the standards of the regulation. Thus, there is no question that Igel failed to comply with the plain terms of the regulation. Igel's primary contention is that Testa was not *exposed to* the hazard.

A review of the record, however, shows that the ALJ's finding that Testa was exposed to the hazard is supported by substantial evidence. The compliance official who issued the citation testified that the hazard from the higher pressure came from "flying rocks and dirt which could be displaced" by the highly compressed air. Igel asserts that, while that might be a theoretical hazard, Testa was not actually exposed to the hazard because he was wearing plastic glasses; the air nozzle handle was over two feet long; the nozzle was

1. Item 1, for failing to wear proper safety goggles, was vacated by the administrative law judge and is not presented for review by this Court.

pointed away from him; and his face was four feet away from the area he was cleaning with the air. A cited employer, however, may not escape liability for a violation by claiming that its equipment, despite its non-complying use, is safe for employee use. *National Eng'g & Contracting Co. v. OSHA*, 928 F.2d 762, 768 (6th Cir.1991).

Further, Igel introduces a photograph of Testa from the day in question in which he claims there is no mud or dirt on his face or hardhat. Yet, the compliance official testified that there was, in fact, mud on Testa's shirt shoulder and helmet, and the photo of Testa taken at the scene shows that there is mud on his hat and shoulder. The uncontroverted evidence is that Testa was using the very high-pressure air (over five times the prescribed limit), in a hand-held nozzle, to clean the mud off the alarm, such that he was directly exposed to the hazard of "blowback" flying dirt and rocks from the near distance of four feet. It is irrelevant whether the mud on Testa's hat and shoulder actually came from "blowback" from the compressed air, because Testa was clearly in a position of exposure to such blowback. Hence, the ALJ had "substantial evidence" to conclude that Testa was exposed to the hazard. *See J.L. Foti Const. Co. v. OSHRC*, 687 F.2d 853, 854–56 (6th Cir.1982) (finding compliance officer's testimony substantial evidence of violation); *R.P. Carbone Const. Co. v. OSHRC*, 166 F.3d 815, 820 (6th Cir. 1998)("[T]his court's function is not to reweigh the evidence, but simply to determine if substantial evidence supports the ALJ's decision.").

Igel's second argument with respect to the air pressure citation is that it does not meet the standard to be a "serious violation" under 29 U.S.C. § 666(k), which provides that a violation is not to be deemed "serious" unless there is a substantial probability that death or serious physical harm will result. The Commission here does not address this argument, and the ALJ did not analyze the seriousness separately from the analysis of the hazard. Nonetheless, the ALJ did affirm this citation as a serious one, so we must examine whether the evidence of the hazard was substantial enough to prove a risk of serious injury.

The requirement of a serious violation refers not to the probability that injury will occur but to the probability that, if an accident were to occur, death or serious injury could result. *Illinois Power Co. v. OSHRC*, 632 F.2d 25, 28 (7th Cir.1980); *East Texas Motor Freight, Inc. v. OSHRC*, 671 F.2d 845, 849 (5th Cir.1982). For this violation, the ALJ found that the hazard was the potential for flying rocks and dirt to hit the employee. Having rocks fly at one's head does create a risk of serious injury, especially because Testa was not wearing safety glasses but his own prescription lenses.[2] His lack of proper facial protection increased the likelihood that any objects that hit his face would injure him more seriously. Furthermore, the compressed air here had a pressure over five times the standard, thus creating an even greater possibility of a serious injury. Therefore, the ALJ's finding that this was a "serious" violation was not an arbitrary or capricious decision and was based on substantial evidence. Accordingly, this compressed air violation is affirmed in its entirety.

## 2. The lockout device violation (Item 3).

Regulation 29 C.F.R. § 1926.601(b)(10) provides that "[t]rucks with dump bodies shall be equipped with positive means of

---

2. The lack of safety goggles was Item 1 of the citation, which the ALJ vacated because wearing goggles is in the control of the employee. Therefore, according to the ALJ, the fact that Testa did not wear his goggles was unforeseeable employee misconduct.

support, permanently attached, and capable of being locked in position to prevent accidental lowering of the body while maintenance or inspection work is being done." It is undisputed that Igel sent Testa to the site to clean the backup alarm even though the dump truck was not equipped with a lockout device. As with the violation of the compressed air standard discussed *supra*, Igel neither disputes the applicability of the regulation nor that it was not in technical compliance with the regulation, but instead argues that Testa was not exposed to the hazard. Additionally, Igel argues that this violation was based on unforeseeable/unpreventable employee misconduct and that it should not be held liable for this violation.

With respect to the exposure (or lack of) argument, Igel asserts that because the dump truck was turned off, hydraulically it was impossible for the dump bed to collapse and injure Testa. Further, Igel argues that due to the angle and configuration of the dump bed, it could not collapse onto an employee. Finally, Igel states that the large wheels and tires on the truck made it physically impossible for an employee to get "into" the truck and be exposed to a dump bed collapse.

Igel made all these arguments to the ALJ, but he rejected them. Rather, the ALJ found that Testa was in the "zone of danger" of the collapsing dump bed, and that it was possible for the dump bed to collapse. The ALJ's decision explained that Testa had "access" to the hazard:

> Mr. Testa did testify that he came, if I accept the totality of his testimony, that he came within six inches of a crush point [i.e., about half the span of a forearm]. Exposure is not just being actually exposed. It's having access to a hazard and to a zone of danger. Mr. Testa

clearly was within the zone of danger not only of being able to be crushed by the truck body coming down and crushing him between the bed and the frame, but also just the bed of the truck coming down could strike an individual who is six inches from a crush point or even up to three feet from the backup alarm itself.

(ALJ's Decision and Order, dated February 8, 2001, JA at 15–16.)

■ Furthermore, the ALJ stated that he found the credibility of the compliance officer to be greater than that of Testa, and the officer testified that Testa had also reached into the area between the dump bed and truck frame to pull dirt and mud out of the alarm area. The compliance officer also testified that hydraulic fluid can leak, and if it did, the dump bed could lower suddenly. Thus, there was substantial evidence that Testa was exposed to the "zone of danger" of a collapse.

■ Nonetheless, Igel disputes this finding that Testa was in the "zone of danger" due to the impossibility of the dump bed falling while the truck was turned off, and that the hazard to Testa was only "theoretical." At oral hearing and in his reply brief,[3] counsel for Igel argued that there was no employee exposure to a hazard as a matter of physical and scientific fact and that the ALJ should not have accepted the compliance officer's testimony that the dump bed could come down and injure an employee. According to Igel, pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), any form of expert testimony must

---

3. Although we will generally not hear issues raised for the first time in a reply brief *see Bendix Autolite Corp. v. Midwesco Enterprises,* *Inc.,* 820 F.2d 186, 189 (6th Cir.1987), the Court in its discretion considers (and ultimately rejects) Igel's argument here.

be supported by appropriate validation and underscored by valid scientific testing or methodology. As such, Igel maintains that the ALJ erred when he accepted as fact the OSHA compliance officer's unqualified lay opinion that it might be possible for the dump bed to come down and crush an employee, especially where OSHA did not consult the manufacturer, did not examine or test the dump bed's hydraulics, and did not have any case studies to support the compliance officer's conclusion.

Igel's argument that the compliance officer was not an appropriate "expert" is entirely unpersuasive and its logical extension would prove cost prohibitive. OSHA's regulations already presume a level of expertise. The Court should afford great deference to an agency's expertise in construing the statute it administers. *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Modern Drop Forge Co. v. Secretary of Labor*, 683 F.2d 1105, 1114 (7th Cir.1982)(standards that apply when specific conditions are met presuppose the existence of hazards, and the Secretary need not show that non-complying conditions are actually hazardous in enforcement proceedings). Igel maintains that it was impossible for the dump bed to come down and injure an employee because the truck was turned off. If this were the case, then presumably OSHA would not need its current regulation mandating lockout devices and would merely have provided that during maintenance work the trucks must be turned off. Igel essentially wants to use this case to challenge the underlying validity of regulation 29 C.F.R. § 1926.601(b)(10) which provides that trucks with dump bodies must be equipped with lockout devises to prevent accidental lowering of the body in case there is mechanical failure. This is not the appropriate forum for such a challenge. Furthermore, requiring "expert" testimony at every OSHA compliance hearing to essentially relitigate the validity of the regulation at issue would be a colossal waste of administrative resources.

After considering the evidence, including the officer's testimony, the ALJ found that Testa was close enough to the dump bed to be in an area where he could be injured by a collapse and such a collapse could occur. Again, such a collapse because of hydraulic or mechanical failure is exactly the hazard that this regulation is meant to prevent. Thus, the ALJ's finding that Testa had "access" to the hazard is supported by substantial evidence and Igel's argument that it was "impossible" for the dump bed to fall is unavailing.

Interestingly, Igel's argument is undermined by its own safety policy, which requires employees to lock out dump beds when performing maintenance on dump trucks. As Igel's safety policy is built on the premise that mechanics like Testa are exposed to hazards from a potential dump bed collapse when those employees are doing maintenance on areas underneath dump beds, it cannot credibly argue that Testa was not exposed to a hazard. Joseph Igel even led a safety talk after the inspection in question, emphasizing that the lockout device is necessary to prevent the hydraulics from "bleeding off" and creating the potential for the bed to crush a worker. Igel's safety materials provide the same caveats; therefore, undisputedly, the company realizes the hazards here and it is disingenuous for it to argue that it was "impossible" for the bed to collapse and injure a worker.

Igel also asserts that the ALJ erred because he failed to make a finding that it was "reasonably predictable" that Testa would be in the zone of danger (i.e., that he would be exposed to the hazardous condition). Yet, the Secretary need not show that exposure was "reasonably predictable" where there is actual exposure.

*See Field & Assoc. Inc.,* 19 O.S.H. Cas. (BNA) 1379, 1383, 2001 WL 769006 (2001) ("[T]he Secretary could establish exposure by showing that employees were actually exposed to the hazard, or that it was reasonably predictable that during the course of their normal work duties, employees might be in the 'zone of danger' posed by the condition."). Here, where Testa himself admitted that he came within six inches of being vulnerable to being crushed, it was not unreasonable for the ALJ to find that he was in a striking distance of being injured and thus actually exposed to danger.

Finally, Igel argues that even if this were a violation and Testa was exposed to a hazard, this violation was due to unforeseeable/unpreventable employee misconduct. As this Court has stated, "[t]o establish employee misconduct as an affirmative defense, an employer must carry its burden of showing that due to the existence of a thorough and adequate safety program that is communicated and *enforced* as written, the conduct of its employee(s) in violating that policy was idiosyncratic and unforeseeable." *CMC Elec. Inc. v. OSHA.* 221 F.3d 861, 866 (6th Cir. 2000) (citation omitted) (emphasis added).

Igel claims that it satisfied the requirements of this defense because Testa violated its instruction to use a lockout device when performing maintenance on the dump truck. Yet, the standard requires that Igel "equip" its dump trucks with lockout devices. 29 C.F.R. § 1926.601(b)(10). Igel's failure to equip the truck at issue cannot be attributed to Testa who was sent out to the site to repair the backup device—not to reequip the dump truck with a lockout device. The responsibility to equip the truck with a lockout device was the responsibility of the company, not of Testa himself. Therefore, the ALJ correctly found that this affirmative defense was not applicable to this violation.

Nonetheless, the ALJ also considered the substance of this defense. Though the ALJ found that Igel does have a good, written safety policy, there was testimony that the lockout device had been missing from this dump truck for at least a week. It is questionable whether the Igel safety program was really "thorough" because, although the night mechanic and driver had responsibility to conduct regular safety inspections of the trucks, the company did not provide a way for them to report deficiencies to management. Thus, there is no way to prove whether the safety plan was really enforced. The ALJ also found that, even if Igel was not aware of the missing device, it should have been aware of it through reasonable diligence, because the lockout device was missing for one to two weeks. The ALJ found that the officials could have known of the problem if they had instituted adequate reporting controls. Igel has not taken exception to this finding, which establishes that Igel's safety program was inadequate to prevent this type of violation. With a safety system with an inadequate mechanism for reporting problems and a lockout device missing for one-two weeks, the lack of a device cannot be called "idiosyncratic and unforeseeable." Thus, the ALJ's finding that Igel has not established the affirmative defense of unforeseeable employee misconduct is supported by the evidentiary record.

### III. CONCLUSION

For the reasons discussed above, the Final Order of the Commission is AFFIRMED.