KELLY SPRINGFIELD TIRE
COMPANY, INC., Petitioner,

v.

Raymond J. DONOVAN, Secretary of Labor, and Occupational Safety and Health Administration, Respondents.

No. 82–4389.

United States Court of Appeals,
Fifth Circuit.

April 6, 1984.

Rehearing and Rehearing En Banc
Denied June 18, 1984.

Michael A. Hatchell, Harry L. Gillam, Jr., Tyler, Tex., for petitioner.

Domenique Kirchner, Atty., Dept. of Labor, F.P.L.B., Washington, D.C., for respondents.

Before GOLDBERG, GEE and TATE, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case Petitioner, Kelly Springfield Tire Company ("Kelly"), seeks a review of a final order of the Occupational Safety and Health Review Commission ("the Commission"). The Commission found that Kelly committed a serious violation of the Occupational Safety and Health Act's ("the Act") general duty clause. 29 U.S.C.

§§ 654(a)(1) and 666(j).[1] This court finds that the determination below is supported by substantial evidence and affirms.

## I. BACKGROUND

Kelly, a subsidiary of Goodyear Tire Company, has manufactured passenger car tires in its plant in Tyler, Texas since 1962. With approximately 500 employees working three eight hour shifts, the facility turns out tires around the clock. One part of the production processes, "rib-buffing," involves the grinding away of a thin layer of rubber along the rib of a tire to reveal a white sidewall. This process produces large quantities of rubber particles from the tire's rib and white dust from the whitewall. Occasionally, the friction of the grinding stone against the tire generates enough heat to ignite the rubber particles, producing sparks and rubber embers.

### A. The Machine

Kelly uses a "ventrijet dust collection system" to remove accumulations of the rubber particles and white-wall dust. Functioning like a giant vacuum cleaner, the system sucks up the refuse through pick-up nozzles connected to a sheet metal hood which fits over the grinding stone. The ground particles flow through the nozzles into a duct which leads to a large, box-like piece of equipment called the dust collector. A fan in the dust collector, capable of drawing 10,000 cubic feet of air per minute, creates the vacuum which draws the particles through the ductwork into the collector.

From the ductwork, the air enters a large chamber partially filled with water. Some of the dust particles fall into the water at this point. The air is then forced into a companion chamber through a row of "venturi tubes." The water level in the chambers is such that the air's movement through the tubes creates a disturbance, causing dust particles and water to combine. Weighted down by the water, the particles fall to the water's surface, eventually sinking to the bottom of the chamber to be removed as "sludge" by a conveyor belt. Clean air is expelled from the collector through another series of ducts.

Throughout the tire manufacturing industry, fires are common in this type of dust collection system. Suffering around 70 such fires in the last 15 years, Kelly maintains a permanent fire brigade specifically to fight rubber dust fires. Proper water level is critical in sustaining a vacuum in the system and preventing fires. With decreased vacuum pressure, dust can accumulate in the system and increase the potential that ignited rubber particles will start a fire. Dust accumulation may be minimized by maintaining proper water levels around the venturi tubes and by adhering to the manufacturer's recommendation to remove dust accumulations once a week.

### B. The Incident

On May 12, 1978, a fire occurred in the ductwork at rib buffer No. 11 which, along with rib buffers Nos. 9 and 10, fed into dust collection system No. 4. The fire was quickly extinguished. A staff mechanical engineer responding to the fire alarm was advised that the water level was low in dust collector No. 4. One of Kelly's area mechanics investigated No. 4 and determined the water level was indeed low. He opened the collector's access door to investigate the cause of the low water level, which turned out to be a malfunctioning automatic water control valve. About the

---

**1.** 29 U.S.C. § 654(a)(1):

    Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

29 U.S.C. §§ 666(j):

    For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

time he shut the door, he heard a fire alarm indicating a fire at the No. 9 rib buffer. He left the dust collector and proceeded towards the rib buffer. About 10 to 15 seconds after the mechanic had closed the access door, dust collector No. 4 exploded. The explosion blew the cast iron access doors off their hinges and bulged the sides of the collector unit. Although the dust collector was located in a work area, no one was hurt.

### C. Proceedings Below

In the days following the explosion, compliance officers for the Occupational Safety and Health Administration inspected Kelly's Tyler plant. Based on the inspection, the Secretary of Labor cited Kelly[2] for a serious violation of the general duty clause, 29 U.S.C. §§ 654(a)(1) and 666(j). Kelly contested the citation and the case was assigned to a Commission Administrative Law Judge (the "ALJ"). At the hearing Kelly called as witnesses five of its own employees and one employee of Goodyear, its parent corporation. Their testimony suggested that neither Kelly nor the tire industry in general recognized an explosion hazard from the operation of the ventrijet dust collection system. Thomas I. Rutledge, a regional sales manager for the Carborundum Company, a manufacturer of dust collection systems, also testified for Kelly. He claimed that he was not aware "that there was—or is—an explosion hazard." Record, 255.

The Secretary of Labor countered by calling as a witness James Tarr, a chemical engineer specializing in air pollution abatement systems.[3] He testified that the way in which Kelly operated its dust collection system constituted a hazard. Given the history of fires at the plant, he claimed that explosions were a "foreseeable" and "predictable" consequence of Kelly's operation of its dust collection system. Record, 202–206. In addition, cross-examination of Mr. Rutledge resulted in his admission that in "a circumstance where there is a history of fires inside a water scrubber and a known problem with low water levels," he would recommend "venting panels" to protect against the dangers of an explosion. Record, 260.

After the hearing, the ALJ found that neither Kelly's management nor the industry in general recognized an explosion hazard from operation of dust collection systems like the one at Kelly. Accordingly, he vacated the citation. The Commission, by a vote of 2–1, reversed the judge's factual findings and affirmed the citation. Finding that the hazard was recognized, the majority simply credited Mr. Tarr's testimony and Mr. Rutledge's cross examination statement over contrary testimony from Kelly's experts. The Commission further found that feasible measures existed—i.e., cleaning dust accumulations from the collector and ducts and installing a "bounced air system"[4] to control water levels—by which Kelly could have materially reduced the hazard. Kelly now petitions this Court for review of the Commission's final order.

## II. ISSUES ON APPEAL

■ To establish a violation of the general duty clause, the Secretary must prove that (1) the employer failed to render its

---

2. The citation reads as follows:
   The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or were likely to cause death or serious physical harm to employees, in that: On or about May 12, 1978, at approximately 8:30 a.m., the employer did not maintain and/or operate the No. 4 Ventrijet Dust Collector System in a manner to insure that its employees were protected from the hazards of an explosion.

3. Although Mr. Tarr had no experience in the tire industry itself, he testified as to his familiarity with low-energy water scrubbing systems, of which the ventrijet dust collection system was one type. Record, 188.

4. A "bounced air system" forces a stream of air through a tube submerged in the collector's water reservoir. As the water level rises and drops, resistance to the air exiting from the submerged tube changes. Variations in resistance activate a switch which controls the supply of water. Such a system was installed in the Tyler plant subsequent to the OSHA inspection. Record, 53.

workplace free of a hazard; (2) the hazard was "recognized" and (3) the hazard caused or was likely to cause death or serious physical harm. *Georgia Electric Co. v. Marshall,* 595 F.2d 309, 321 (5th Cir.1979); *Getty Oil Co. v. OSHRC,* 530 F.2d 1143, 1145 (5th Cir.1976); *National Realty and Construction Co. v. OSHRC and Secretary,* 489 F.2d 1257, 1265 (D.C.Cir.1973). Kelly focuses its main arguments on the second and third elements of the Secretary's burden. In its arguments concerning the second element, Kelly points to the nature of the testimony relied on by the Secretary. The company contends that the evidence adduced at the hearing is insufficient to support a finding that the hazard was recognized. With respect to the third element of proof, Kelly admits that "an explosion of the magnitude involved here has the potential to cause bodily injury." Petitioner's Brief, 18. Kelly argues, however, that this fact alone is insufficient to prove that the hazard "caused or was likely to cause death or serious physical harm." Rather, this court should impose a new standard, looking to whether the operation of the dust collector produced a "significant risk" of explosion.

## III. ANALYSIS

### A. Recognition of the Hazard

The broad issue that we face today is whether the Commission's findings are supported by substantial evidence. 29 U.S.C. § 660(a). This court is bound by the Commission's findings on questions of fact and reasonable inferences drawn therefrom if they are supported by substantial evidence on the record, even if we could justifiably reach a different result de novo. *H.B. Zachry Co. v. OSHRC,* 638 F.2d 812, 815 (5th Cir.1981); see also, *NLRB v. United Ins. Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Furthermore, this "substantial evidence" review focuses on the Commission's final order; the Commission and not the ALJ occupies the factfinder's role under the Act. *Champlin Petroleum Co. v. OSHRC,* 593 F.2d 637, 640 (5th Cir.1979); *Acu-Namics, Inc. v.*

*OSHRC,* 515 F.2d 828, 834 (5th Cir.1975), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976).

Establishing that a hazard was recognized requires proof that the employer had actual knowledge that the condition was hazardous or proof that the condition is generally known to be hazardous in the industry. *Georgia Electric Co. v. Marshall, supra,* 595 F.2d at 321. Whether or not a hazard was recognized constitutes a matter of objective determination. *Id.* Kelly labels the Tarr testimony as a "kitchen chemistry" approach, maintaining that Mr. Tarr testified only as to "abstract scientific principles." The company also points to Mr. Tarr's admission that he didn't specifically know "what the general belief in the tire-making industry is." Kelly claims that reliance on his statements is inconsistent with the recognition standard articulated in *Georgia Electric Co., supra.*

These contentions are without support. Labeling Mr. Tarr's statements as a "kitchen chemistry" approach mischaracterizes his testimony. He declared, without reservation, that Kelly's operation of dust collector No. 4 constituted a hazard. Record, 202. He also indicated that an explosion was a "predictable" and "foreseeable" consequence. Record 202–206. His inability to specifically testify to the subjective beliefs of those in the tire-making industry is not dispositive. A finding of industry recognition does not require direct evidence of the subjective beliefs of those working in the relevant industry. Courts have, in various circumstances, found a hazard to be recognized absent direct evidence of subjective belief. For example, where a hazard is "obvious and glaring," the Commission may determine that the hazard was recognized without reference to industry practice or safety expert testimony. *Tri-State Roofing v. OSHRC,* 685 F.2d 878, 880 (4th Cir.1982); *Cape & Vineyard Div. v. OSHRC,* 512 F.2d 1148, 1153 (1st Cir.1975). In addition, where a practice is plainly recognized as hazardous in one industry, the Commission may infer recognition in the industry in question. *St.*

*Joe Minerals v. OSHRC,* 647 F.2d 840, 845, n. 8 (8th Cir.1981); *Usery v. Marquette Cement Mfg. Co.,* 568 F.2d 902, 910 (2nd Cir.1977).[5]

■■■ The recognition standard centers on "the common knowledge of safety experts who are familiar with the circumstances of the industry or activity in question." *National Realty and Construction Co. v. OSHRC, supra,* 489 F.2d at 1265, n. 32. Mr. Tarr, held by the Commission to be such an expert, stated his recognition of a hazard. His explication of so called, "abstract scientific principles" served to indicate why other safety experts would recognize a hazard. Mr. Rutledge, an employee in the industry that manufactured the dust collection systems, stated that he would recommend explosion panels given a history of fires and low water levels in a dust collector. Viewing this evidence in the light of the standard announced in *National Realty,*[6] we hold that the Commission could reasonably infer that the hazard was recognized.[7]

### B. A Significant Risk Standard?

Kelly's argument regarding the third element of the Secretary's burden—"the haz-

ard caused or was likely to cause death or serious physical harm"—raises an important and undecided issue of law. Citing *Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), (the "Benzene Case") and *Pratt and Whitney Aircraft v. Secretary of Labor,* 649 F.2d 96 (2nd Cir.1981) ("Pratt and Whitney I"), the company contends that the Commission's determination of a violation should be reversed because the evidence does not demonstrate that Kelly's practices posed a "significant risk of harm." In the Benzene Case, the Supreme Court reviewed a standard promulgated by the Secretary of Labor to regulate occupational exposure to benzene, a carcinogenic substance. Remanding the review petition to the Secretary for further proceedings, a four justice plurality held, *inter alia,* "before he can promulgate *any* permanent health or safety standard, the Secretary is required to make a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices." (Emphasis in original.) 448 U.S. at 643–44, 100 S.Ct. at 2864–65.[8] In *Pratt*

---

**5.** We note parenthetically that courts' willingness to infer industry recognition from indirect evidence derives support from R. Morey, "The General Duty Clause of the Occupational Safety and Health Act of 1970," 86 Harv.L.Rev. 988 (1973). Morey observes that, "there will obviously be some variances as to what is required in different industries because of their differing levels of sophistication in detecting hazards." *Id.* at 1002. His solution is to limit "such de facto variation of statutory liability standards" by requiring "some minimum amount of consultation by the industry in general, or by the particular employer, with industrial safety experts." *Id.*

**6.** We defer to the Commission's decision to credit the Tarr and Rutledge testimony over statements by Kelly's witnesses. The Commission is not bound by the ALJ's credibility determinations. *Allis-Chambers Corp. v. OSHRC,* 542 F.2d 27, 30 (7th Cir.1976). We will not overturn the Commission's basic credibility determinations unless they are contradicted by "uncontrovertible documentary evidence of physical facts." *See Cleveland Consolidated, Inc. v. OSHRC,* 649 F.2d 1160, 1168 (5th Cir.1981).

**7.** As an additional argument that the Secretary failed to meet his burden, Kelly contends that the cause of the May 12 explosion was never definitely determined. Kelly's emphasis on the explosion is misplaced. Proof of a link between the "hazard" and a particular accident is not critical to establishing a general duty clause violation. *See Champlin Petroleum v. OSHRC, supra,* 593 F.2d at 642. As the Third Circuit has observed:

> Our task on review is not to look for a proximate cause relationship between the accident which preceeded the inspection and the specific violation charged, but to determine whether there is substantial evidence in the record supporting the charge that the employer maintained at the time and place alleged a recognized hazard to the safety of its employees.

*Bethlehem Steel Corp. v. OSHRC,* 607 F.2d 871, 874 (3rd Cir.1979).

**8.** *See also Texas Indep. Ginners' Ass'n v. Marshall,* 630 F.2d 398, 407 (5th Cir.1980) (applying the significant risk standard to OSHA's standards for cotton dust exposure in the ginning industry).

*and Whitney I, supra,* the Second Circuit extended the "significant risk" standard to Commission *enforcement* of a particular safety standard. The Secretary had cited a company for violating 29 C.F.R. § 1910.-94(d)(7)(iii) which prohibits the use of common exhaust systems where a combination of the vented substances "may constitute a fire, explosion, or chemical reaction hazard." Considering the Benzene Case and *Pratt and Whitney I,* we must decide whether the significant risk standard should be further extended and displace existing law with respect to enforcement of the general duty clause.

In previous cases concerning the general duty clause's "likely to cause death ..." provision, courts have focused primarily on the seriousness of the accident should it occur. The likelihood of the accident itself has received only low level scrutiny, leaving the Commission's expertise predominant in the area. The D.C. Circuit, in discussing a citation issued to a company for certain practices involving construction equipment, noted

> Presumably, any given instance of equipment riding carries a less than 50% probability of serious mishap, but no such mathematical test would be proper in construing this element of the general duty clause [citing *Morey, supra,* n. 5]. If evidence is presented that a practice could eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances, the Commission's expert determination of likelihood should be accorded considerable deference by the courts.

*National Realty, supra,* 489 F.2d at 1265, n. 33. In view of the Act's general goal of reducing industrial carnage, other courts have also found this limited deference to Commission expertise to be proper. *See Donovan v. Royal Logging Co.,* 645 F.2d 822, 829 (9th Cir.1981); *Illinois Power Co. v. OSHRC,* 632 F.2d 25, 28 (7th Cir.1980). Extension of the significant risk standard to enforcements of the general duty clause would constitute an abandonment of the *National Realty* standard. The significant risk standard, as enunciated in the Benzene case, looks equally to the likelihood of an accident and the seriousness of the potential harm. *Pratt and Whitney Aircraft v. Donovan,* 715 F.2d 57, 64 (2nd Cir.1983), (Pratt and Whitney II) *citing* W. Prosser, Law of Torts § 31, at 147 (4th ed. 1971).

Neither the Benzene Case nor *Pratt and Whitney I* justify such a change in enforcement of the general duty clause. In the *Benzene* case, the relevant holding was very narrow.[9] The Supreme Court specifically declared that the significant risk standard applies to OSHA's functions in "*promulgating* permanent health or safety standard[s]." (emphasis supplied) 448 U.S. at 643, 100 S.Ct. at 2864. Moreover, the Court's holding depended, to a significant degree, on provisions of the Act relating only to issuance of standards. The section of the Benzene opinion establishing the significant risk standard begins:

---

**9.** Despite the narrow holding, the plurality opinion in the Benzene Case contains some broad dicta: "Both the language and structure of the Act, as well as its legislative history, indicate that it was intended to require the elimination, as far as feasible, of significant risks of harm." 448 U.S. at 642, 100 S.Ct. at 2864. While we would, in any event, discount this dicta in the face of the Supreme Court's specific limitations on the Benzene holding (*see infra* at 324), it appears that a majority of the Court disagrees with the dicta. In providing the fifth vote for the plurality's result, Justice Rehnquist stated that, "the language of § 6(b)(5) gives the Secretary absolutely no indication where on the continuum of relative safety he should draw his line," *id.* at 676, 100 S.Ct. at 2881, and rejects the conclusion that "§ 3(8) acts as a general check upon the Secretary's duty under § 6(b)(5) to adopt the most protective standard feasible." The four dissenters found that a significant risk standard would never be appropriate:

> The plurality does not show how the [significant risk] requirement can be plausibly derived from the "reasonably necessary or appropriate" clause. Indeed, the plurality's reasoning is refuted by the Act's language, structure, and legislative history, and it is foreclosed by every applicable guide to statutory construction.

*Id.* 448 U.S. at 709, 100 S.Ct. at 2898. In sum, the interpretation of the Benzene Case presents us with an enigmatic riddle, common in plurality opinions and confounded in this case by the language at issue being dicta.

Our resolution of the issues in these cases turns, to a large extent, on the meaning of and the relationship between § 3(8), which defines a health and safety standard ... and § 6(b)(5) which directs the Secretary in promulgating a health and safety standard for toxic materials....

448 U.S. at 639, 100 S.Ct. at 2863. The fact that the instant controversy does not involve OSHA standards or their promulgation significantly limits the relevance of the *Benzene* case here. *See Modern Drop Forge Co. v. Secretary of Labor*, 683 F.2d 1105, 1115 (7th Cir.1982) (the Benzene Case "chiefly examined the scope of the Secretary's rule making authority under section 6(b)(5).").

Another factor limiting the significant risk holding in the Benzene Case derives from the Supreme Court's emphasis on unconstitutional delegation of legislative authority. That emphasis clearly surfaces in the plurality opinion, Justice Stevens reasoning that if the significant risk standard wasn't applicable, "the statute would make such a 'sweeping delegation' of power that it might be unconstitutional." 448 U.S. at 647, 100 S.Ct. at 2866. In fact, Justice Rehnquist's concurrence is based primarily on this constitutional argument. *Id.* at 672–689, 100 S.Ct. at 2879–2887. Because nondelegation doctrine has no relevance to enforcement of the general duty clause, we cannot choose our course based on guidance from the Benzene Case. *See Modern Drop Forge Co., supra*, 683 F.2d at 1115; *Super Excavators, Inc. v. OSHRC*, 674 F.2d 592, 595 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1350 (1982).

██ Similarly, the Second Circuit's extension of the significant risk standard in *Pratt and Whitney I* does not convince us

to make a further extension in today's case. *Pratt and Whitney I* reversed the enforcement of a particular regulation issued by the Secretary. The regulation in question, 29 CFR § 1910.94(d)(7)(iii), required that an employer take measures for situations that *"may* constitute a fire explosion or chemical reaction hazard." [10] The regulation at issue in *Pratt and Whitney I* obviously presumes no hazard. This absence of a presumed hazard lay at the heart of the holding in *Pratt and Whitney I. Modern Drop Forge Co., supra*, 683 F.2d at 1115. Presumption of a "hazard," as defined and refined by years of both administrative and judicial determinations, prevents the problems of vagueness which concerned the court in *Pratt and Whitney I. Modern Drop Forge, supra*, 683 F.2d at 1115; *see Georgia Electric v. Marshall, supra*, 595 F.2d at 322 n. 32. *Ensign-Bickford Co. v. OSHRC*, 717 F.2d 1419, 1421 (D.C.Cir.1983). Thus, presumption of a hazard, as under the general duty clause [11], makes unnecessary the imposition of a significant risk standard. *See, id.*

██ Congress' purpose in passing the Act was to assure "so far as possible every working man and woman in the Nation safe and healthful working conditions." *American Textile Mfrs. Institute Inc. v. Donovan*, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). The existing three-pronged burden for proving a general duty clause violation imposes substantial limits on the Secretary's discretion in enforcing that Congressional mandate. In calculating the proper judicial standard of review, we perceive no reason to impose any additional burden on the Secretary. Given Congress' goals, current law provides the proper standard for reviewing citations under the general duty clause. Courts should defer to the "Commission's expert determi-

---

**10.** Drawing a hairline distinction between "accident" and "hazardous incident" the *Pratt and Whitney I* Court evaded the significant risk issue with respect to the general duty clause. It cited with approval, however, *Usery v. Marquette Cement Mfg.*, 568 F.2d 902 (2d Cir.1977), in which the "dangerous condition" or "hazardous incident" was "far from a mere possibility," but

where the "recurrence of a similar employee accident may have been merely a possibility." 649 F.2d at 101, n. 1. In any event, *Pratt and Whitney I* did not establish a significant risk standard with respect to the general duty clause.

**11.** *See supra* n. 1.

nation of likelihood" if evidence is presented "that a practice could eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances." [12]

## IV. CONCLUSION

In sum, we reject both of Kelly's major arguments. The Commission was justified in crediting testimony of Messrs. Tarr and Rutledge over conflicting testimony by Kelly's witnesses. The absence of direct evidence regarding subjective knowledge of individuals working in the tire-making industry does not invalidate the Commission's conclusions. Moreover, by proving that the practice at issue could cause serious physical harm other than as a result of a "freakish or utterly implausible concurrence of circumstances," the Secretary satisfied the "likely to cause" element of his burden. Consequently we affirm the order of the Commission.

AFFIRMED.

GEE, Circuit Judge, dissenting:

Conceding that Kelly Springfield did not actually know of the explosion hazard in its Ventrijet dust collection systems and that the hazard was not known in the tire industry, the majority nevertheless holds that the explosion potential of the dust collection systems was a recognized hazard, imposing liability on Kelly Springfield under the general duty clause. 29 U.S.C. § 654(a)(1) (1976). Because this seems to me an unwarranted and unfortunate expansion of the definition of recognized hazard, I respectfully dissent.

To establish a violation of the general duty clause, the Secretary must show that the employer failed to render its workplace free of a recognized hazard that caused or was likely to cause death or serious physical harm. *Georgia Electric Co. v. Marshall*, 595 F.2d 309, 320–21 (5th Cir.1979). To constitute a recognized hazard, the dangerous potential of a condition or activity must actually be known either to the particular employer or generally in the industry. *Id.* at 321; *Pratt & Whitney Aircraft v. Secretary of Labor*, 649 F.2d 96, 100 (2d Cir.1981).

Here, it is undisputed that Kelly Springfield did not know of the explosion hazard in its dust collection system. Moreover, there is no evidence that anyone in the tire industry knew of the hazard. The majority states, however, that a finding of industry knowledge does not require direct evidence of the subjective beliefs of those working in the relevant industry. Citing *Tri-State Roofing v. OSHRC*, 685 F.2d 878, 880 (4th Cir.1982), they note that when a hazard is obvious and glaring, the Commission may determine that the hazard was recognized without reference to industry knowledge. Although this rule is sound, it does not apply to our case. Here, the hazard was not so obvious that the industry must have known about it. Indeed, the record contained no evidence of any other explosion in a Ventrijet system, either at Kelly Springfield's plant or at any other tire-making plant.

Thus, the majority discerns a recognized hazard where there is no evidence that any tire-making employer knew of the hazard and where the hazard was not so obvious that the employers should have known of it. To reach its decision, the majority relies on dicta to be found in a footnote in a D.C. Circuit opinion stating that a recognized hazard can be found if the hazard is within "the common knowledge of *safety experts* who are familiar with the circumstances of the industry or activity in question." *National Realty & Construction Co. v. OSHRC*, 489 F.2d 1257, 1265 n. 32 (D.C.Cir.

12. Kelly raises the same "significant risk" argument with respect to the Secretary's proof of a serious violation under section 17(k). It is beyond dispute, however, that a violation may be deemed serious "where, although the accident itself is merely possible (i.e., in statutory terms 'could result from a condition'), there is a substantial probability of serious injury if it does occur." *Shaw Const., Inc. v. OSHRC*, 534 F.2d 1183, 1185 (5th Cir.1976); *see also, East Texas Motor Freight v. OSHRC*, 671 F.2d 845, 849 (5th Cir.1982). Thus, Kelly's challenge to the finding of a serious violation also fails.

1973) (emphasis added). Applying this standard, the majority imputes knowledge of the explosion hazard to the tire industry through the testimony of a chemical engineer specializing in air pollution abatement systems (with no experience in the tire industry), to the effect that Kelly Springfield's operation of the Ventrijet systems constituted a hazard.

Our Circuit has never adopted this standard and it is a mistake to do so here. This test equates recognition of hazards with foreseeability of hazards: what hazards are reasonably foreseeable by safety experts? It is clear, however, that "there is a vast difference between what is known or recognized and what is reasonably foreseeable." *Pratt & Whitney Aircraft*, 649 F.2d at 101. Congress did not intend the general duty clause to cover every "plausible, theoretical possibility that a condition or activity could cause an employee to incur serious injury." *Id.* Rather, the general duty clause was intended to cover "the most flagrant of situations and for which the Secretary had not promulgated appropriate regulations." *Anning-Johnson Co. v. OSHRC*, 516 F.2d 1081, 1086 (7th Cir. 1975). Such flagrant situations occur where the employer *knew* of the hazard, or *should have known* of it, because other employers in the industry had recognized the hazard or because the danger of the hazard should have been obvious to anyone. That an independent safety expert can postulate the theoretical possibility of a hazardous condition does not mean that an employer should have recognized it as such.

Moreover, the majority's rule will require employers to hire safety experts to search their plants for any possibility of an unsafe condition, whether or not the employer has any reason to believe that a hazardous condition exists. While this will, of course, result in safer working conditions, it is unreasonable to believe that Congress intended to impose upon employers—especially small business ones—the financial burden of hiring such experts when there is no hint that any hazard is present.

The new test espoused by the majority expands the concept of recognized hazard to include hazards that employers do not and have no reason to know about. Because this is not supported by any case in our Circuit or by the intent of Congress, and because it seems to me unwise and unfair, I must respectfully dissent.