# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 18, 2013

No. 12-60810

Lyle W. Cayce
Clerk

ACME ENERGY SERVICES, doing business as Big Dog Drilling,

Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; THOMAS E. PEREZ, SECRETARY, DEPARTMENT OF LABOR,

Respondents.

Petition for Review of an Order of the
Occupational Safety and Health Review Commission
OSHRC Docket No. 08-0088

Before HIGGINBOTHAM, OWEN, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

The Secretary of Labor issued Petitioner Big Dog Drilling (Big Dog) a citation and corresponding $7,000 penalty for violating the general duty clause of the Occupational Safety and Health Act (the Act).[1] The citation alleged Big Dog committed a serious violation of the Act by exposing its workers to a recognized "struck-by" hazard during a "scope-up" process, which resulted in the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 29 U.S.C. § 654(a)(1).

No. 12-60810

death of Gabriel Chavarria, a Big Dog employee. The Administrative Law Judge (ALJ) vacated the citation, concluding that the Secretary failed to establish that (1) either Big Dog or its industry recognized the hazard, and (2) the proposed means of abatement could feasibly eliminate or materially reduce the hazard. The Occupational Safety and Health Review Commission then reversed the ALJ decision and affirmed the citation and penalty, holding that the Secretary had established both industry recognition and a feasible means of abatement. Big Dog now appeals the Commission's decision.

## I

Big Dog operates numerous oil drilling rigs. In July 2007, Big Dog was setting up Rig 3, a telescoping rig, at a worksite in Stanton, Texas. Telescoping rigs consist of two masts, one inside of the other, which are transported to the drilling site in a horizontal position on a truck or "carrier." At the drilling site, the rig is then raised in two stages. First, a hydraulic mechanism on the carrier is used to raise the lower mast—which still contains the upper mast—to a vertical position, and to secure the mast on an elevated platform called the rig floor. Second, the upper mast is raised or "scoped" from within the lower mast by another hydraulic mechanism, a ram located in the mast itself, and a system of cables, pulleys, and counterweights, to a height of 104 feet.

On the day of the accident, the Big Dog crew was scoping the upper mast on Rig 3. A 10,500-pound pulley block, counterweights, and other equipment were suspended by heavy cables from the top of the upper mast. As scope-up began, the Big Dog crew consisted of seven employees: two operators, Bobby Ruth and Mark Steele (the "tool pushers"); the deceased employee Chavarria working as the driller; two rig hands who stood on the ground toward the back of the drilling rig; and two welders who were in an enclosure next to the rig floor called the "dog house." The tool pushers stood at the controls located on the sides of the rig by the mast base: Ruth was positioned behind the mast,

2

operating the scoping controls, and Steele was positioned to the left side of the mast, operating the brakes for the pulley block. Chavarria was eight to ten feet away from Steele, and was on the racking board, which is a portion of the rig floor. Chavarria's job was to observe the various cables to make sure they did not tangle, to ensure a platform called the belly board folded out correctly, and to communicate any problems he observed to Steele and Ruth.

As the upper mast was being scoped up, it slid down inside the lower mast after the hydraulic ram gave way and fell onto the rig floor. The pulley block, other equipment suspended from the mast, and all of the drilling lines also fell. Chavarria was struck and killed. He was found lying on the rig floor with the ram on his left side and the pulley block on his right side.

After an investigation of the accident, the Secretary issued Big Dog a citation for violating the Act's general duty clause and assessed a $7,000 penalty.[2] The citation charged Big Dog with exposing its employees to the hazard of being struck by equipment during scope-up operations on telescoping drilling rigs. This original citation said that, to abate the hazard, only personnel required to carry out the operation should be allowed "in or under the mast unless it is in the fully raised or lowered position."[3] The Secretary later amended the citation to add that "[n]o one other than the operator should be allowed on the carrier platform in the derrick or under the mast until well servicing units are fully scoped, raised, or lowered."

---

[2] The citation was for a violation of Section 5(a)(1) of the Act, which requires each employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

[3] The original citation also provided that, "[a]mong other methods, one feasible and acceptable abatement method to correct this hazard would include insuring no personnel is on the drill floor when telescoping the mast." However, this language was removed in the amended citation.

No. 12-60810

Big Dog contested the citation and received a hearing before an ALJ. Several Big Dog employees testified at the hearing, including Ruth. An expert witness, Ronald Britton, testified for the Secretary, and he relied on various industry safety manuals in forming his opinion. After the hearing, the ALJ determined that the Secretary proved the first and third elements of a general duty clause violation: Big Dog employees were subject to a hazard of being struck by equipment on the rig floor during scope-up, and the hazard caused death or serious physical harm. The proof on the second and fourth elements, however, was insufficient according to the ALJ. Specifically, the Secretary failed to prove that Big Dog or the oil industry recognized the activity was hazardous, and that the hazard was preventable through the proposed abatement method.

The Commission granted review of the ALJ decision, and on review, it reinstated the citation and assessed the Secretary's proposed $7,000 penalty. The Commission held that the Secretary had established all requisite elements of a general duty clause violation, including demonstrating that the industry recognized the hazard created by the scope-up procedure and that there was a feasible means of abatement. Big Dog now appeals the Commission's decision.

## II

We review the Commission's factual findings for "substantial evidence on the record considered as a whole."[4] Substantial evidence requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] Under this standard, the court must uphold the Commission's factual findings if properly supported "even if this court could justifiably reach a different result *de novo*."[6] Furthermore, under the Act, "the Commission is the

---

[4] 29 U.S.C. § 660(a); *see also Chao v. OSHRC*, 401 F.3d 355, 362 (5th Cir. 2005).

[5] *Chao*, 401 F.3d at 362 (citation omitted).

[6] *Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423, 426-27 (5th Cir. 2001).

No. 12-60810

fact-finder, and the [ALJ] is an arm of the Commission for that purpose."[7] When an ALJ and the Commission come to contrary conclusions, the Fifth Circuit considers the ALJ's findings, but only to the extent they "weaken the contrary conclusion of the Commission" and suggest a lack of substantial evidence.[8] We thus review only the Commission's final order for substantial evidence.[9] Finally, the Commission's legal conclusions must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[10]

## III

Big Dog first argues that the Commission erred by not applying an abuse of discretion standard to the ALJ's conclusions regarding the testimony of Britton, the Secretary's expert witness. Big Dog contends that the ALJ's treatment of Britton's opinion amounted, in effect, to a decision not to admit it under Federal Rule of Evidence 702, so the Commission had to apply an abuse of discretion standard to the ALJ's exclusion of Britton's opinion.

The Federal Rules of Evidence apply to Commission proceedings.[11] Under Rule 702, an expert may testify if: (1) the expert's specialized knowledge will help the trier of fact understand the evidence, (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles, and (4) the expert reliably applied those principles to the case.[12] A district court's admission or exclusion of testimony under Rule 702 is reviewed for an abuse of

---

[7] *Accu-Namics, Inc. v. OSHRC*, 515 F.2d 828, 834-35 (5th Cir. 1975) (discussing 29 U.S.C. §§ 660-61 and accompanying regulations).

[8] *See Champlin Petroleum Co. v. OSHRC*, 593 F.2d 637, 640 (5th Cir. 1979).

[9] *Accu-Namics, Inc.*, 515 F.2d at 834 (citing 29 U.S.C. § 660(a)).

[10] *Trinity Marine Nashville, Inc.*, 275 F.3d at 427 (citation omitted).

[11] 29 C.F.R. § 2200.71.

[12] FED. R. EVID. 702.

No. 12-60810

discretion.[13]  Likewise, when the Commission reviews an ALJ's admission or exclusion of expert testimony under Rule 702, it reviews for an abuse of discretion.[14]

Here, however, the ALJ never excluded Britton's testimony based on Rule 702.  At the hearing, the ALJ found Britton qualified to testify as an expert, and Big Dog did not object to Britton testifying in this capacity.  In his decision, the ALJ subsequently decided that Britton's opinion regarding industry recognition did "not hold up under scrutiny" because he did not think certain safety manuals supported Britton's opinion and because he thought the rig manufacturer's video showing an individual on the rig floor during scope-up "undermine[d]" Britton's opinion.  Yet there is no indication that the ALJ ever excluded or disregarded Britton's testimony under Rule 702.  Instead, the ALJ simply declined to afford Britton's opinion much weight in light of other evidence.  The Commission therefore correctly held that the ALJ "found that Britton's conclusions were outweighed by other evidence" but "never found—implicitly or explicitly—that Britton's testimony was inadmissible."  Because the ALJ never excluded or disregarded testimony under Rule 702, the Commission did not have to review the ALJ's expert testimony findings for an abuse of discretion.

## IV

Big Dog also contends that the Commission erred in setting aside the ALJ's findings regarding the credibility of witnesses.  When the Commission reviews an ALJ's decision, it will reject any factual findings contrary to the

---

[13] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999); *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 366 (5th Cir. 2006).

[14] *U.S. Postal Serv.*, No. 04-0316, 2006 WL 6463045, at *10 (OSHRC Nov. 20, 2006) ("[F]inders of fact are normally accorded wide latitude in determining whether proffered expert testimony would be helpful, and courts will not overturn an exclusion finding on this basis unless it is shown that the judge abused his discretion."); MARK A. ROTHSTEIN, OCCUPATIONAL SAFETY & HEALTH LAW § 17.18 (2013) (same).

preponderance of the evidence.[15]   If the ALJ's findings are rejected, the Commission can make its own findings.[16]  As between the Commission and the ALJ, the Commission has ultimate fact-finding responsibility, and we review only the Commission's findings for substantial evidence.[17]

Although the Commission normally rejects ALJ fact findings if they are contrary to the preponderance of the evidence, it affords more deference to the ALJ's witness credibility determinations.[18]  According to the Commission, the ALJ, as the original trier of fact, has "the opportunity to observe the demeanor of the witnesses, evaluate their credibility, and weigh the evidence accordingly."[19]  Therefore, "the policy of the Commission ordinarily is to accept [an ALJ's] evaluation of the credibility of witnesses because it is the judge who has 'lived with the case, heard the witnesses, and observed their demeanor.'"[20]

Ultimately, however, as this court stated in *Kelly Springfield Tire Co. v. Donovan*,[21] "[t]he Commission is not bound by the ALJ's credibility determinations."[22]  In *Kelly Springfield Tire Co.*, as here, the Secretary issued

---

[15] *See Worcester Steel Erectors, Inc.*, 16 BNA OSHC 1409, 1993 WL 387711, at *11 (No. 89-1206, 1993).

[16] *See Accu-Namics, Inc. v. OSHRC*, 515 F.2d 828, 834 (5th Cir. 1975) ("This overview of the statute and regulations demonstrates that the Commission itself is charged with findings of fact."); *see also* MARK A. ROTHSTEIN, OCCUPATIONAL SAFETY & HEALTH LAW § 18:9 (2013) (same).

[17] *Accu-Namics, Inc.*, 515 F.2d at 834.

[18] *See Okland Constr. Co.*, 3 BNA OSHC 2023, 1976 WL 5934, at *2 (No. 3395, 1976).

[19] *Id.*

[20] *E. L. Jones & Son, Inc.*, No. 87-0008, 1991 WL 11668264, at *3 (OSHRC Mar. 18, 1991) (citation omitted).

[21] 729 F.2d 317 (5th Cir. 1984).

[22] *Kelly Springfield Tire Co.*, 729 F.2d at 322 n.6; *see also Allis-Chambers Corp. v. OSHRC*, 542 F.2d 27, 30 (7th Cir. 1976) (holding that "the Commission was not bound by [the ALJ's] credibility determinations, as long as its findings are supported by substantial

No. 12-60810

a citation, the ALJ vacated the citation, and the Commission reversed the ALJ's decision.[23] The Fifth Circuit affirmed the Commission's decision, noting that it deferred to the Commission's crediting of certain testimony over other testimony on the issue of industry recognition.[24] In holding that the Commission was not bound by the ALJ's credibility determinations, the Fifth Circuit reaffirmed that it only reviews the Commission's decision for substantial evidence.[25] Thus, the Commission's policy of deference does not change the fact that, if the Commission rejects the ALJ's credibility findings but the Commission's findings themselves are supported by substantial evidence, we will affirm the Commission's decision. Accordingly, we need not decide whether the Commission followed its own policy of deference here—the only question is whether the Commission's findings are supported by substantial evidence.

## V

Big Dog asserts that, even if the Commission did not have to defer to the ALJ on witness credibility, it should have instead remanded the case back to the ALJ if the ALJ's credibility findings were inadequate. Big Dog contends that a case must be remanded back to the ALJ if it does not "include findings of fact, conclusions of law, and the reasons or bases for them, on all the material issues of fact, law or discretion presented on the record."[26]

We reject this argument for two reasons. First, the ALJ's 35-page decision was extremely thorough, and the ALJ made extensive fact findings. Although

---

evidence").

[23] *Kelly Springfield Tire Co.*, 729 F.2d at 320.

[24] *Id.* at 319, 322 & n.6.

[25] *See id.* at 321 ("[S]ubstantial evidence review focuses on the Commission's final order.") (internal quotation marks omitted).

[26] 29 C.F.R. § 2200.90(a) (Commission Rule 90(a)).

the ALJ's decision to credit Ruth on the meaning of "under the mast" was not supported by demeanor-based findings, the ALJ still made clear it was crediting Ruth's testimony. On the broader issue of industry recognition, the ALJ also provided specific reasons for not crediting Britton's testimony: the manuals Britton relied upon were irrelevant and the manufacturer's video contradicted his testimony. By contrast, in the cases Big Dog cites, the ALJs failed to make necessary credibility determinations,[27] to provide any reasons for their credibility determinations,[28] and to make other essential findings of fact.[29] As a result, these cases are distinguishable from this case, where the ALJ did all three of these things.

Second, simply because the Commission often remands for additional findings does not mean that remand is required in every case.[30] As the ultimate finder of fact in the statutory scheme, the Commission can reverse the ALJ

---

[27] *See Boh Bros. Constr. Co.*, 23 BNA OSHC 1321, 2010 WL 5128948, at *1-2 (No. 09-0239, 2010) (explaining that the ALJ's findings did not specifically address the credibility of the testimony of two witnesses on a material issue, and remanding the case so that the judge could "specifically determine the credibility" of the two witnesses' testimony); *Asplundh Tree Expert Co.*, 6 BNA OSHC 1951, 1978 WL 7087, at *5 (No. 16162, 1978) (stating that it could not resolve a key issue "without specific findings by the Judge concerning whether Ashworth, Pewitt, and Herder were credible witnesses" and remanding the case for credibility findings).

[28] *See Thunderbolt Drilling, Inc.*, 10 BNA OSHC 1981, 1982 WL 22643, at *1 (No. 81-1798, 1982) (remanding in part because "[t]he judge cited testimony tending to prove the charge and testimony tending to disprove it, and did not state why he resolved the testimony in favor of the Secretary").

[29] *See P & Z Co.*, 6 BNA OSHC 1189, 1977 WL 7903, at *1, *5 (No. 76-431, 1977) (remanding because "the Judge failed to set forth specific findings of fact that are essential for our review of the case"); *Evansville Materials, Inc.*, 3 BNA OSHC 1741, 1975 WL 22094, at *2 (No. 3444, 1975) (remanding because the ALJ failed to make several "necessary" and "basic" fact findings that were "subsidiary to the finding of whether the safe lifting capacity of the derrick was exceeded and the ultimate finding of whether there was a recognized hazard").

[30] *See Accu-Namics, Inc. v. OSHRC*, 515 F.2d 828, 834 (5th Cir. 1975) ("[T]he statutory scheme contemplates that the Commission is the fact-finder, and the judge is an arm of the Commission for that purpose."); *see also* OCCUPATIONAL SAFETY & HEALTH LAW: COMPLIANCE AND PRACTICE § 12:6 (2013) (noting that "the Commission has the authority to make factual findings where the Judge has not").

decision based on its own factual findings without remanding. For both of these reasons, the Commission was not required to remand for further credibility determinations.

## VI

Big Dog further contends that no substantial evidence supports the Commission's finding that the Secretary proved the second element of a general duty clause violation: that the hazard is recognized. "To establish a violation of the general duty clause, the Secretary must prove that (1) the employer failed to render its work place free of a hazard; (2) the hazard was 'recognized'; . . . (3) the hazard caused or was likely to cause death or serious physical harm . . . [and] (4) the hazard must be preventable."[31] Under the second element, a recognized hazard is "a condition 'that is known to be hazardous'" and "can be established by proving that the employer had actual knowledge that a condition is hazardous" or "by proving that the condition is generally known to be hazardous in the industry."[32]

On the element of hazard recognition, Big Dog argues that the only evidence supporting industry recognition is the testimony of Britton, and Britton's opinion was based largely on manuals that do not apply to this case. Even if the manuals did apply, Big Dog says they are contradicted by the manufacturer's video showing employees on the rig floor during scope-up. The Secretary, on the other hand, contends that Britton's expert opinion—that the industry recognizes that workers on the rig floor are at risk from falling equipment should the mast fail during scope-up—is substantial evidence of industry recognition. Further, according to the Secretary, there is no meaningful distinction between the situations addressed in the manuals and this

---

[31] *Ga. Elec. Co. v. Marshall*, 595 F.2d 309, 320-21 (5th Cir. 1979) (referencing the Act's general duty clause, 29 U.S.C. § 654(a)(1)).

[32] *Id.* at 321 (citations omitted).

case, and some of the manuals actually do address the situation here. The Secretary adds that the manufacturer's video is not relevant, but even if it were, the Commission could credit Britton's testimony over the video.

We hold there was substantial evidence to support the Commission's finding that the industry recognized the hazard of being struck by equipment during scope-up. The hazard "recognition standard centers on 'the common knowledge of safety experts who are familiar with the circumstances of the industry or activity in question.'"[33] Here, Britton was such an expert, and his testimony that, based on his experience, the industry recognized the hazard was itself substantial evidence of industry recognition. Britton's view was that "the [oil drilling] industry is well aware and recognizes that employees are exposed to struck-by hazards on the drill floor during rig-up operations on a telescoping rig." Britton said he would never have someone stand "in the area that [Chavarria] was at the time that he was killed" during scope-up because, with the mast and suspended equipment towering over the relatively small rig floor, "[t]here really isn't anywhere on the rig floor that he is not exposed." His opinion, Britton testified, was consistent with what the "leaders" in the industry recognize as hazards. Based on this testimony, "the Commission could reasonably infer that the hazard was recognized."[34]

There was conflicting testimony from Ruth on the issue of industry recognition. Ruth testified that he was unaware of any accidents where a mast failed and someone on the racking board was killed; that he would not have expected an accident to have occurred as it did; and that at the time of the

---

[33] *Kelly Springfield Tire Co. v. Donovan*, 729 F.2d 317, 322 (5th Cir. 1984) (quoting *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1265 n.32 (D.C. Cir. 1973)).

[34] *See id.* at 321-22 (explaining that the court was "bound by the Commission's findings on question of fact and reasonable inferences drawn therefrom if they are supported by substantial evidence on the record" and concluding that the Commission could reasonably infer industry recognition based largely on expert testimony).

accident, he did not think it was dangerous to have someone on the racking board. Yet even Ruth conceded there are many ways in which scope-up could go wrong, which is why the other crew members were not on the rig floor, and why Big Dog had a "general rule" prohibiting it.

Moreover, despite this conflicting testimony, the Commission provided good reasons for crediting Britton's opinion over Ruth's. The Commission explained that Britton was a registered professional petroleum engineer, and had more than forty years of experience working with "pretty much every" major drilling company; manufacturing, building, and operating his own drilling rigs; and scoping up rigs just like Rig 3. Understandably, the Commission found that this experience was "directly relevant to the issue of industry recognition." In comparison, although Ruth had worked for decades in the drilling industry, he had only worked for four companies with telescoping rigs and only as a driller or tool pusher, while Britton had worked in various capacities for more drilling companies, including serving as a consultant tasked with inspecting accident sites. The Commission, therefore, justifiably believed Britton over Ruth on the issue of hazard recognition.

In addition to his decades of experience, Britton also based his opinion on various safety manuals, which he said reflected the hazards the industry recognizes. The Commission found that the manuals provided further support for industry recognition since, based on Britton's testimony, they either *directly applied* to this case or addressed analogous situations that were *equally applicable* to this case. After crediting Britton's meaning of "under the mast" as comprising the entire rig floor, the Commission found that the company manuals prohibiting employees from working "under the mast" during scope-up were directly applicable since Chavarria was under the mast. Additionally, although some of the manuals referred to a hazard to employees on a "carrier" or "carrier platform" rather than on a "rig floor," Britton testified that the manuals'

recognition of a hazard on a carrier was equally applicable to a rig floor. Based on his testimony that the rig floor is functionally the same thing as a carrier platform, the Commission found manuals referring to carrier platforms equally applicable to Chavarria's position on the rig floor here. Thus, the manuals that either directly apply or equally apply to this case provide additional support for Britton's opinion that the industry recognized the hazard.

The Commission concluded by explaining that its finding of industry recognition was not undermined by the rig manufacturer's video showing it testing the rig by scoping the mast while one of its employees stood on the rig floor. The Commission first found that the video was "of little relevance here as it depicts a manufacturer demonstrating the mast without suspended equipment, not a drilling company using the mast for its stated purpose with the equipment attached." Even if the video was evidence of industry practice, the Commission said that "the video only represents what one company did on one day" whereas Britton's expert opinion was "based on over 40 years of experience working with nearly every drilling company." Relying on its own precedent, the Commission gave more weight to Britton and his extensive experience. Because the Commission justifiably relied on Britton's expert testimony over Ruth's testimony and the manufacturer's video, we hold that substantial evidence supports the Commission's finding of industry recognition.

## VII

Big Dog finally argues the Secretary did not prove by substantial evidence the fourth element of a general duty clause violation. To establish this fourth element, the Secretary must "show that demonstrably feasible measures would materially reduce the likelihood that such injury as that which resulted from the

cited hazard would have occurred."[35]  Under this standard, the Secretary is not required to show the abatement would completely eliminate the hazard.[36]

The Secretary here asserted, in his amended citation, that a feasible method of abating the struck-by hazard was complying with the following portion of an American Petroleum Institute (API) Recommended Practice:

> Only personnel required to carry out the operation shall be allowed in or under the mast unless it is in the fully raised or lowered position.  No one other than the operator should be allowed on the carrier platform in the derrick or under the mast until well servicing units are fully scoped, raised, or lowered.

The Commission concluded that this proposed means of abatement was feasible since the driller's duties can be performed from the ground, rather than from the rig floor, and that the abatement would materially reduce the hazard.

Substantial evidence supports the Commission's finding that removing the driller from the rig floor was feasible because it was possible for drillers to perform their duties from the ground.  The driller's duties during scope-up are to watch the pulley system's cables to ensure they do not become entangled, to watch to make sure the belly board folds out correctly, to communicate with other personnel if issues arise, and to help problem-solve if necessary. Testimony established that four others do the same job as the driller does at the same time: the two tool pushers on the rig floor and the two rig hands on the ground.  Relying on Ruth's testimony that the driller was really just a "third set of eyes," the Commission found that the driller did not need to be on the rig floor. Ruth also acknowledged that scope-up is a quiet process, so communication between the driller and others would not be impaired by more distance. Moreover, if the driller had to help with problem-solving, Ruth testified it would

---

[35] *Champlin Petroleum Co. v. OSHRC*, 593 F.2d 637, 640 (5th Cir. 1979).

[36] *Morrison–Knudsen Co.*, 16 BNA OSHC 1105, 1993 WL 127946, at *19 (No. 88-572, 1993).

take only a little extra time for the driller to assess a situation if he were on the ground and had to go up to the rig floor. Britton said that problem-solving would only begin after scope-up was halted, suggesting that any delay in the driller going up to the rig floor would not affect safety. Based on this testimony, the Commission could easily find it was feasible to position the driller off the rig floor.

There is also substantial evidence to support the Commission's finding that the proposed abatement will materially reduce the struck-by hazard. While there was no direct testimony that having the driller on the ground materially reduces the hazard, and falling equipment could still strike a driller on the ground, there was nevertheless enough evidence from which the Commission could infer that having the driller on the ground would materially reduce the hazard.[37] First, the Commission found that positioning the driller on the ground may not eliminate *every* struck-by hazard, but that any adverse effects were minor compared to the safety benefits.[38] That finding is a reasonable inference from Britton's testimony that standing on the rig floor under a suspended load is dangerous, as well as the commonsense notion that being further away from equipment that could fall is safer.[39] The Commission also found that the rig

[37] *See Kelly Springfield Tire Co.*, 729 F.2d at 321 (explaining that we are "bound by the Commission's findings on questions of fact and reasonable inferences drawn therefrom if they are supported by substantial evidence").

[38] *Cf. Chevron Oil Co.*, 11 BNA OSHC 1329, 1983 WL 23864, at *5 (No. 10799, 1983) (finding that "[t]he benefit afforded by the use of flotation devices greatly outweighs the harm that could be caused").

[39] The Secretary's proposed abatement method here is analogous to a method accepted by the Sixth Circuit in a case involving the hazard of being struck by felled trees. *See Nelson Tree Servs., Inc. v. OSHRC*, 60 F.3d 1207, 1211 (6th Cir. 1995). There, the abatement method included "preventing employees not directly involved in the felling operation from walking in front of a notched tree." *Id.* The court held there was substantial evidence that the method was feasible and would "eliminate or substantially reduce the hazard of being struck by a prematurely felled tree" and stated that "Nelson Tree Services could and should have restricted the access of persons not directly involved in the felling process." *Id.* Similarly,

floor's elevation made it more difficult for a driller to escape in the event of an equipment failure, so positioning the driller on the ground would provide a better chance of escape should a failure occur. Again, this is a reasonable inference based on the fact that the rig floor is nine feet off of the ground. Because the Secretary only has to prove the proposed abatement will materially reduce the incidence of the hazard, not eliminate it,[40] the Commission reasonably concluded the Secretary satisfied its burden.

Furthermore, we reject Big Dog's argument that it actually complied with the proposed abatement method—that "[o]nly personnel required to carry out the operation shall be allowed in or under the mast"—because the driller is "required" personnel in the scope-up process. The Commission considered and rejected this argument, finding that the driller is not required to carry out the operation from the rig floor. Although there was some conflicting testimony on how effectively the driller could perform his job from the ground,[41] the Commission weighed this evidence and its ultimate conclusion that the driller could still perform his duties from the ground is supported by the record.

Big Dog's remaining attacks on the proposed abatement method are also unpersuasive. According to Big Dog, the abatement method in the amended citation, which is based on an API Recommended Practice, only applies to "well servicing units" and not drilling rigs like Rig 3. The Commission correctly held that, regardless of whether the Recommended Practice was intended to apply only to servicing rigs, the Secretary only needs to show the method is feasible or

---

here, the abatement method involved keeping further away employees not required to be on the rig floor—the place most likely to be hit by falling equipment.

[40] *Morrison–Knudsen Co.*, 1993 WL 127946, at *19.

[41] *Compare* "Q Okay. It's perfectly feasible for the fifth man, which would be [Chavarria], to do the job that he was doing—watching the cables as well—from somewhere other than under these suspended loads. Right? A Yes.", *with* "Q The job [Chavarria] was doing can be done just as effectively from the ground. Right? A No."

"capable of being done."[42]  Because moving the driller off the rig floor is capable of being done, this argument ultimately fails.  Big Dog also says it complied with the abatement method because Chavarria was not "under the mast" as the method prohibits.  But, for good reasons, the Commission rejected Ruth's narrow interpretation of "under the mast" in favor of Britton's interpretation, which covered the area where Chavarria stood.  Consequently, the contention that Chavarria was not "under the mast" can also be rejected.

In conclusion, we hold that substantial evidence supports the Commission's finding that the Secretary proved the fourth element of a general duty clause violation.  Because substantial evidence also supports the finding that the industry recognized the struck-by hazard under the second element, and because there is no other basis for reversal, we affirm the Commission's decision.

\*     \*     \*

For the foregoing reasons, the judgment of the Commission is AFFIRMED.

---

[42] *Beverly Enters., Inc.*, 19 BNA OSHC 1161, 2000 WL 34012177, at \*34 (No. 91-3144, 2000)).